[Crim. No. 7320. In Bank. May 3, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. BOOKER T. HILLERY, JR., Defendant and Appellant.

Booker T. Hillery, Jr., in pro. per., Hugh Wesley Goodwin and Tom Okawara, under appointment by the Supreme Court, for Defendant and Appellant.

Stanley Mosk and Thomas C. Lynch, Attorneys General, Doris H. Maier, Assistant Attorney General, and Edsel W. Haws, Deputy Attorney General, for Plaintiff and Respondent.

TOBRINER, J.—The jury found defendant guilty of first degree murder and fixed the penalty at death. The court denied defendant's motion for a new trial and entered judgment on the verdict. This appeal comes to us automatically under Penal Code section 1239, subdivision (b).

On November 14, 1963, we unanimously affirmed the judgment of death entered upon the conviction of murder in the first degree.* We granted a rehearing to consider this case in light of our recent decision in *People* v. *Morse* (1964) 60 Cal.2d 631 [36 Cal.Rptr. 201, 388 P.2d 33]. Subsequently we requested counsel to file briefs as to what effect, if any, the recent decision of the United States Supreme Court in *Esco-*

.*(Cal.) 34 Cal.Rptr. 853, 386 P.2d 477.

*bedo* v. *Illinois* (1964) 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977], has upon the disposition of this case.

Although the failure of the police to inform the defendant of his right to counsel and his right to remain silent constitutes error under the holdings of *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977], and *People* v. *Dorado* (1965) *ante*, p. 338 [42 Cal.Rptr. 169, 398 P.2d 361], we find that the introduction of statements elicited during the interrogation was not, under the facts of this case, prejudicial. With reference to the penalty phase of the trial however, we find that the rendition of instructions identical to those condemned in *People* v. *Morse* (1964) 60 Cal.2d 631 [36 Cal.Rptr. 201, 388 P.2d 33], coupled with the presentation of certain arguments to the jury necessarily worked prejudical error. (*People* v. *Hines* (1964) 61 Cal.2d 164 [37 Cal.Rptr. 622, 390 P.2d 398].)

Before discussing the above issues it is appropriate to answer each of the contentions made by defendant in his original appeal and reiterated in his petition for rehearing. These contentions are that the evidence did not sufficiently connect defendant with the crime or support the verdict of murder in the first degree; that the prosecuting attorney was guilty of prejudicial misconduct; that the court erred in refusing to allow testimony of a grand jury witness to be read at the trial; and that the indictment should have been quashed on the ground that members of defendant's race (Negro) were systematically excluded from the grand jury which indicted him. By supplemental brief defendant also contends that illegally obtained evidence was introduced against him.

The above points were fully briefed, carefully considered by the court, and resolved against the defendant by a unanimous court in an opinion filed prior to the granting of the rehearing. We find nothing in the petition to compel a revision of the views we expressed at that time. Accordingly, that portion of the opinion dealing with these issues, as written by Justice Schauer, is incorporated herein and reads as follows:

Defendant entered a plea of not guilty to an indictment charging him with the murder of Marlene Miller on March 21, 1962. The victim, a 15-year-old girl, lived with her parents and brother in a rural area some 5 miles from Hanford. On the evening of the crime Marlene's brother was at work and her parents left at 6:15 to attend night classes. Mar-

lene remained at home alone to do some sewing. The lights were on, the window shades were up, and the doors were unlocked. At approximately 8:30 p.m. Bev Honegger telephoned the Miller home and conversed briefly with Marlene. When Mr. and Mrs. Miller returned at 9:55 p.m. they found Marlene missing. The television set was playing loudly, the sewing machine light was on, an ironing board was set up and the iron was hot. In the master bedroom a sleeping bag that was normally stored on a cedar chest was on the floor, as were a coat and a blanket. A window in the exterior wall of Marlene's room was raised, and the window screen had been removed and was lying outside on the grass.

The police arrived five or ten minutes later in response to Mr. Miller's call and undertook an examination of the entire area. A mashed leaf was found on a trellis near the open window of Marlene's bedroom; and a gloved handprint was detected on the top of a television set in front of that window, showing the hand intruding toward the interior of the house. There were scuff marks on the ground outside, which appeared to have been made by the side of a shoe being dragged over the earth. A trail of blood spots led to the bank of a nearby irrigation ditch. Partial footprints were found, and prints of a small tennis shoe.

Marlene's body was discovered the following morning, submerged in an irrigation ditch some 75 to 100 yards west of the Miller home. Evidencing a source for the trail of blood spots, a pair of large sewing shears bearing the name ''Marlene M.'' was embedded up to the handles in her chest. The pointed blades had been thrust downward into her body at a point immediately above the sternal notch, puncturing a lung and causing death by massive hemorrhaging and shock. The points of the scissors were lodged in the posterior wall of the chest cavity. A towel and a half-slip were found knotted around her neck. Her wrists were securely tied behind her back with a piece of cord similar to that on the Miller sleeping bag, which had apparently been cut. On one foot she wore a tennis shoe; the other foot was bare. Her blouse was pulled down around her shoulders, pinning her arms to her body. Her brassiere was pulled upwards, exposing her breasts. Her jeans were ripped open down the back and through the crotch. There were several stab marks on the body where attempts were made to rip the jeans before the final rip was made down the seam. Her underpants were torn, exposing her private parts. Her legs were drawn up and her knees were spread

apart. There were bruises on her chin, back, and knees. Marlene was dead, but apparently she had won part of her battle: the external genitalia showed no bruises or other trauma and the hymen was intact.

The Miller home is situated on the corner of Elder Avenue and 10th Avenue, and there is a stop sign on Elder at this intersection. Approximately two tenths of a mile to the east on Elder is a dirt road known as Tome Lane. One-half mile to the west of the Miller home on Elder is the Ferreira ranch, where defendant was employed on the date of the murder, March 21, 1962 (and had been so employed since June 1961). Marlene had worked as a baby-sitter for the Ferreira family on a number of occasions during the spring of 1962, one of which was shortly before March 21.

At 8:45 p.m. on the day of the crime a high school student noticed defendant's automobile, a 1952 Plymouth with an unusual paint combination, parked in Tome Lane just off Elder. A second witness saw defendant's car in that location at about the same time. Tire marks were found in the lane after the murder; they were photographed, and ink impressions were made of the tires on defendant's car. Expert testimony established that the marks in the lane had been made by defendant's tires.

A right and a left bootprint were found in Tome Lane near the tire marks. The position of the prints indicated that the wearer had been walking in the direction of the Miller home. Expert testimony established that the prints were made by defendant's boots. There were also stockinged footprints nearby, leading back towards the place where the car was parked.

A pair of mismatched black gloves was found in the weeds "at the edge of the road" along Elder Avenue, to the east of Tome Lane. When found, they were soaking wet. The gloves were traced to defendant by the following evidence:

The right-hand glove (People's Exhibit 34) was black with a red orlon lining, and was similar in appearance and size to a pair sold to defendant sometime before Christmas 1961 by Correll Hicks. Defendant paid for the gloves in the presence of Allean Stallworth, defendant's girlfriend. The latter corroborated Hicks' testimony, and stated that defendant later showed her the gloves and said they were the pair he had bought from Hicks. She further testified that she knew of no other gloves with a red lining owned by defendant; that about a week before March 21, 1962, defendant told her that he had lost one of a pair of gloves; and that the remaining glove,

which he showed her, looked like People's Exhibit 34.

The left-hand glove found on Elder Avenue (People's Exhibit 33), a leather outer glove suitable for wearing over a lining, was identified as similar in appearance to those sold by an army surplus store in Hanford. The manager of that store testified that defendant had been a customer of his; that on January 22, 1962, he wrote out a sales slip in the amount of $1.29 plus tax; and that gloves similar to People's Exhibit 33 were on sale at that time in his store for $1.29 a pair. The sales slip (People's Exhibit 67) was found in the back seat of defendant's car after his arrest.

Defendant's employer, Joe Ferreira, testified that some two weeks prior to March 21 defendant complained of losing a glove; that the remaining one, which defendant showed him, was similar to Exhibit 34; and that defendant thereafter wore the latter in a mismatched pair with a glove similar to Exhibit 33.

A narrow brown belt (People's Exhibit 35) was also found in the weeds on Elder, near the gloves. By contrast with the latter, the belt was not wet. Mr. Ferreira testified that the belt looked just like one used by defendant to hold up hip boots that he wore at work. Among other identifying points of similarity, the belt bore two marks where the hip boots were supported. There was expert testimony that the marks could have been caused by heavy objects such as defendant's hip boots.

Defendant was arrested in his car on the morning of March 22, 1962, in front of the Royal Hotel in Hanford, where he resided. His wallet was examined and was found to contain in one compartment a crisp $10 bill and five one-dollar bills. Marlene's brother testified that the $10 bill was "very similar" in texture to a $10 bill taken from his dresser on the night of the crime, and that one of the one-dollar bills in defendant's wallet bore a crease corresponding to that of a one-dollar bill also taken from the dresser. He further testified that a mug partially full of nickels had been emptied by the intruder; a snap purse in defendant's pocket was found to contain, among other coins, 10 nickels.

At the time of his arrest defendant was asked where he had been the night before. He answered that he had picked his girlfriend up at 8:30 p.m. and had spent the rest of the night with her in his hotel room. The girlfriend, Allean Stallworth, likewise told the officers that defendant had picked her up at 8:30 p.m.

In subsequent statements to the police and in his trial testimony, defendant told a different story. He stated that he left the Ferreira ranch at about 8:15 p.m. on March 21 and drove straight into town, following in his car behind that of Frank Costa, a fellow employe; that at about 8:40 p.m. he parked across the street from the Royal Cafe and Hotel; and that he then went up the hotel stairs to his room where he remained for a couple of hours, cleaning and washing up. Each significant aspect of this story, however, was contradicted by other witnesses:

Frank Costa testified that although he drove away from the ranch with defendant's car behind him, he no longer saw defendant's headlights after he had turned the corner of Elder and 10th (i.e., the location of the Miller home); that he released his gas pedal for 10 or 15 seconds and looked back several times, but did not see defendant following him. Rose Kendall, proprietress of the Royal Cafe, testified that it was her habit to observe the cars on the street near her establishment; that she did so between 8:30 and 10 p.m. on March 21, but did not see defendant's car parked on the street until about midnight. Mrs. Tom Sunoo, manageress of the Royal Hotel, testified that during the evening of March 21 she was seated as usual in her office in a chair facing the head of the hotel stairs, but at no time saw defendant come up those stairs to his room.

With respect to the remainder of the evening, defendant admitted that at about 10 p.m. he entered a laundromat in Hanford and placed his work clothes and his white leather jacket in a washing machine; that he telephoned Mrs. Stallworth from that location at 10:10 p.m., and that he picked her up at her apartment at about 10:20 p.m. (rather than 8:30 p.m., as he had originally told the police). They bought some food at a drive-in restaurant, removed his clothes from the laundromat, left his leather jacket at Mrs. Stallworth's apartment, and spent the rest of the night in his hotel room. The next morning the police found defendant's leather jacket, still damp, hanging over a heater in Mrs. Stallworth's apartment.

Defendant explained the need for washing his clothes that evening by saying that he had been spattered with cow manure while doing the milking at the Ferreira ranch. But Frank Costa, who milked the cows with defendant, testified that there was no manure on defendant's clothes when he left the ranch that evening. Mr. Ferreira testified that to his knowledge defendant never wore his white leather jacket while he did

farm work, but would hang it in the supply room where he kept his boots and work clothes. Mrs. Stallworth testified that she did defendant's laundry during the months of January, February, and March of that year; that defendant gave her his clothes to wash on Thursday of the week preceding the crime, and that she returned them to him on March 21; that in the nine months she had been defendant's girlfriend she had never known him to take his own laundry to the laundromat and wash it himself, and that she had never known him to put his white leather jacket in a washing machine.

On cross-examination defendant admitted that he had a prior conviction of forcible rape.

Defendant contends that the evidence is insufficient to connect him with the crime. He emphasizes that there were no eyewitnesses to the killing, that the precise time of death was not shown, and that "There is no evidence of his being closer to the [Miller] house" than the spot in Tome Lane where his car was parked and his bootprints were found.

The contention is without merit. The People, of course, may rely on circumstantial evidence to connect the defendant with the commission of the crime charged and to establish beyond a reasonable doubt that he was the perpetrator thereof. (*People* v. *Huizenga* (1950) 34 Cal.2d 669, 675 [1]-676 [3] [213 P.2d 710]; *People* v. *Alcalde* (1944) 24 Cal.2d 177, 180-184 [1] [148 P.2d 627].) ▮ Moreover, "It is the trier of fact, not the appellate court, that must be convinced of a defendant's guilt beyond a reasonable doubt. ▮ If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment." (*People* v. *Robillard* (1960) 55 Cal.2d 88, 93 [1-2] [10 Cal.Rptr. 167, 358 P.2d 295, 83 A.L.R.2d 1086]; accord, *People* v. *Love* (1960) 53 Cal.2d 843, 850-851 [1-2] [3 Cal.Rptr. 665, 350 P.2d 705]; *People* v. *Daugherty* (1953) 40 Cal.2d 876, 884 [2]-886 [5] [256 P.2d 911]; *People* v. *Newland* (1940) 15 Cal.2d 678, 680-683 [1] [104 P.2d 778].) ▮ As enunciated by the late Justice Carter in the *Daugherty* case, *supra,* at page 885 [4] of 40 Cal.2d, "The test on appeal is whether there is substantial evidence to support the conclusion of the trier of fact. It is not whether guilt is established beyond a reasonable doubt. . . . [Quoting from *People* v. *Newland* (1940) *supra,* 15 Cal.2d 678, 681 [1]] ▮ 'The court on appeal "will not attempt to determine the weight of the evidence, but will

decide only whether upon the face of the evidence it can be held that sufficient facts could not have been found by the jury to warrant the inference of guilt.'' '' '' The evidence hereinabove related points unequivocally to defendant's presence at the scene of Marlene's murder and, together with the incriminating testimony as to his whereabouts and activities during the evening of March 21, is manifestly sufficient under the just cited rules to support the verdict of guilt.

Defendant also contends that the evidence is inadequate to sustain the jury's determination that the homicide was murder in the first degree. He takes the position that there is no direct evidence to establish any of the elements of the crime, and in particular that there is no evidence of deliberation and premeditation. It is asserted that ''None of the acts enumerated [i.e., committed by defendant on Marlene], except the thrust of the scissors, are sufficient to produce death or contribute in any way to it,'' and that because of the angle of entry of the scissors ''Death here could have been completely unexpected from the thrust. There was no showing that what was done was likely to produce death.'' Defendant concludes that the jury could not reasonably have found that the homicide was accompanied by a deliberate and premeditated intent to kill.

The record refutes this contention: the size of the scissors, the point of entry in Marlene's body, and the reach of the thrust, combine with the other circumstances to leave no rational doubt as to the intent of the killer. ''To establish the crime of first degree murder, direct evidence of a deliberate and premeditated purpose to kill is not required. The necessary elements of deliberation and premeditation may be inferred from proof of such facts and circumstances as will furnish a reasonable foundation for such an inference, and where the evidence is not in law insufficient, the matter is exclusively within the province of the trier of fact to determine.'' (*People* v. *Cartier* (1960) 54 Cal.2d 300, 305-306 [2] [5 Cal.Rptr. 573, 353 P.2d 53]; accord, *People* v. *Cole* (1956) 47 Cal.2d 99, 106 [7] [301 P.2d 854, 56 A.L.R.2d 1435]; *People* v. *Gulbrandsen* (1950) 35 Cal.2d 514, 519 [2] [218 P.2d 977]; *People* v. *Isby* (1947) 30 Cal.2d 879, 888-889 [2, 3, 4] [186 P.2d 405].) It was the People's theory— amply supported by the direct evidence related hereinabove (considered, of course, with the inferences[1] which the jury

[1]Code of Civil Procedure section 1958 provides: ''An inference is a

could reasonably deduce therefrom)—that defendant parked his car a short distance from the Miller home and approached on foot; that he first removed a screen from a window in Marlene's bedroom, but could not enter by that means because his way was barred by a television set (on which the above mentioned gloved handprint was later found) with bottles on top; that he then proceeded instead along the side of the house until he came to one of the unlocked doors and entered surreptitiously; that in passing the dresser of Marlene's brother defendant emptied the wallet and coin mug belonging to the brother; that defendant then seized Marlene while she was absorbed in her sewing, and knotted a towel and half-slip over her head to prevent outcry or identification; that he cut a length of cord from the Miller's sleeping bag and used it to tie Marlene's hands securely behind her back; that he armed himself with his victim's sewing shears and dragged her outdoors and to the irrigation ditch where her body was found; that at some point a scuffle ensued (Marlene was 15 years of age, was 5′ 7″ tall, and weighed 130 pounds) and defendant plunged the shears deep into Marlene's chest; that defendant must have known that a wound of such severity would be likely to cause[2] (as the pathologist testified that it did cause) massive hemorrhaging resulting in death; and that defendant thereafter left his victim trussed up in the water-filled irrigation ditch where, if she were not already dead from the stab wound, defendant must have known that death would ensue by drowning. From this extended course of conduct the jury were amply warranted in finding that the murder of Marlene was deliberate and premeditated.

 The People's additional—and independently adequate —theory of a killing committed in the attempt to perpetrate rape is also sustained by the record. Defendant asserts that "There is nothing in the evidence which establishes the offense as a sexual offense." He stresses the fact that the victim's

---

deduction which the reason of the jury makes from the facts proved, without an express direction of law to that effect.''

Code of Civil Procedure section 1960 provides: ''An inference must be founded:

''1. On a fact legally proved; and,

''2. On such a deduction from that fact as is warranted by a consideration of the usual propensities or passions of men, the particular propensities or passions of the person whose act is in question, the course of business, or the course of nature.''

[2]It will be remembered that defendant asserts that ''Death here could have been completely unexpected from the thrust. There was no showing that what was done was likely to produce death.''

genitalia were uninjured, and apparently argues that an implied finding of attempted rape cannot be sustained unless the evidence specifically shows some trauma in the area of the private parts. Such is not the law (see, e.g., *People* v. *Brubaker* (1959) 53 Cal.2d 37, 43 [4] [346 P.2d 8]). Here there is ample evidence to establish that on the night in question defendant could plainly see from the road that Marlene was at home alone; that he parked his car at the point where it was seen by the witnesses, and where its presence was further demonstrated by the tire prints, and walked from there as indicated by his boot prints, all as hereinabove related; that after entering the house he subdued Marlene, tied her hands behind her back, pulled her blouse down around her shoulders, and pinned her arms to her body; that he pulled her brassiere upwards, exposing her breasts; that he ripped open her jeans down the back and through the crotch; that he tore her underpants, exposing her private parts; and when her body was recovered in *rigor mortis* her legs were drawn up and her knees were spread apart. In the light of the foregoing evidence the People were not required to also prove more specifically the reason that the attack was broken off without the hymen being ruptured; the record as it stands reasonably supports the jury's inference that defendant killed Marlene in the course of an attempt to rape her.

Defendant next cites four instances of alleged prejudicial misconduct by the prosecuting attorney:

1. Defendant complains that in examining prospective jurors on *voir dire* the prosecutor told them that if the evidence showed that defendant had previously been convicted of a felony they could consider that prior conviction in determining the issues of identity and intent. This is a misstatement of the record. Defendant's own counsel first injected the fact of the prior conviction into the *voir dire* proceedings by asking prospective jurors such questions as: ''You won't convict him of this crime merely because in the past he has been convicted of a felony?'' Defendant's counsel then told the prospective jurors that if defendant took the stand his prior conviction could be used against him for impeachment purposes. The prosecutor simply added to this the further explanation that in the event that proof of defendant's prior conduct were to be introduced as evidence of his intent in the present case, the jurors should also consider it for that purpose ''if the Court were to so instruct you. . . .'' This is a

correct statement of the law, and no misconduct appears. Moreover, defendant failed to make timely objection to the remarks now challenged. (*People* v. *Pike* (1962) 58 Cal.2d 70, 88 [14] [22 Cal.Rptr. 664, 372 P.2d 656].)

2. Defendant asserts that the prosecutor in his opening statement to the jury repeated this reference to defendant's prior conviction. No impropriety is shown. In relating the evidence that the People expected to introduce the prosecutor said, *inter alia,* "we are going to make an offer of proof [that] back on November 30, 1954, Booker T. Hillery, early in the afternoon went to the home of Adelaide Domingos on Eleventh Avenue near the intersection of Jackson and what happened there. . . ." At this point defendant's counsel interrupted and cited the statement as prejudicial misconduct. The matter was argued and the court ruled that whether evidence of defendant's prior conviction was admissible was a question of law to be determined at the appropriate time, and hence that any discussion thereof in the opening statement should be omitted. The court further stated, however, that "you might go so far as to state at this time that you expect to show that the defendant committed a prior crime, which would be assuming something to that effect, without going into the details." In compliance with this ruling the prosecutor gave no additional details of the prior crime but confined his remarks on this point to the brief statement that "I will leave [the subject] with the fact that we do intend at the proper time, then, to make an offer of proof on a fact that the defendant had committed a prior rape." At the outset of trial the court explained to the jury that statements of counsel other than stipulations are not evidence, and a formal instruction to that effect was subsequently given. Such admonitions were sufficient to protect defendant's rights.

3. Defendant complains of the prosecution's use of Mrs. Sylvia Hillery, defendant's mother, as a witness. The point is devoid of merit. Mrs. Hillery briefly took the stand and was asked if she had visited Allean Stallworth at defendant's suggestion. An objection was interposed and, out of the jury's hearing, the prosecutor explained to the court that he had received information that Mrs. Hillery had visited Allean at defendant's request for the purpose of soliciting her to give false testimony. The court properly ruled that proof of any such attempt to suppress or manufacture evidence must be tied in to the defendant. The latter's counsel then suggested that the witness be asked "if she was at Allean Stall-

worth's house at the instance and request of the defendant.''
Such a question was put to the witness; she answered in the
negative; i.e., favorably to defendant, and was excused from
further testifying.

4. Defendant contends that it was prejudicial misconduct for the prosecutor to offer into evidence a certain nickel
marked with red fingernail polish. The contention is without
merit. One of the nickels taken from the dresser of Marlene's
brother on the night of the crime bore marks in red nail
polish; defendant told the police (and testified) that he telephoned Allean Stallworth that same evening from a coinoperated telephone in the laundromat where he washed his
work clothes and jacket, and a nickel marked with red nail
polish was among those found in the coin box of that particular telephone when that box was first thereafter opened.
The subject coin was designated People's Exhibit 45 for
identification, and Marlene's brother was asked if it appeared
to be ''marked exactly the same'' as the nickel taken from his
dresser. The witness replied, ''Not exactly the same, but it is
similar,'' and explained that although each nickel had red
nail polish on both faces, the coin taken from his dresser
''seemed to have more polish around the center of the nickel.''
The prosecutor then dropped the matter temporarily but subsequently called a telephone company employe who testified
that when the coin box of the telephone in question was first
opened after the night of the crime (some two weeks later)
he found Exhibit 45 among the coins it contained. The prosecutor then offered Exhibit 45 in evidence. An objection to
its introduction was argued and sustained, and the prosecutor
requested that the coin be left temporarily marked for identification. The court assented, but ruled that it was ''not to be
shown to the jury, not received in evidence.'' On its own
motion the court thereupon admonished the jury that ''It will
be like any other piece of evidence or alleged evidence marked
for identification, not evidence in the case, unless and until it
is admitted by the Court into evidence. The jury has heard
about this coin, and the testimony, and perhaps have seen it
and they are to disregard it entirely the same as though they
had never heard of it unless and until it could later be received into evidence by the court.'' At a later time—and out
of the presence of the jury—Exhibit 45 for identification was
again offered in evidence and was refused by the court. There
is no showing of lack of good faith or any other impropriety
in the production of this coin at the trial; the record demon-

strates that the prosecution could reasonably have believed that it would be allowed into evidence.

 Defendant contends that the court erred in denying his motion to read at the trial the testimony given by James Jenkins before the grand jury in this case. On the first day of trial defendant had given the sheriff a subpoena to be served on Jenkins, but the sheriff had been unable to locate him. It was not error, however, to refuse to allow Jenkins' former testimony to be read into the record under Penal Code section 686, subdivision 3.[3] That statute, as Judge Fricke points out, "is exclusive and prescribes the only circumstances under which the former testimony may be given in evidence as proof of the facts therein recited. . . . Neither does the law permit the reading upon a trial of the testimony of a witness given before the grand jury (*People* v. *Day* [1926] 199 Cal. 78, 87 [8] [248 P. 250]. . . ."[4] (Fricke, California Criminal Evidence (4th ed. 1957) p. 456; see *People* v. *Lint* (1960) 182 Cal.App.2d 402, 419-421 [19] [6 Cal.Rptr. 95].) Defendant also contends that the court erroneously refused to grant a continuance pending further search for Jenkins, but the record refutes this contention.

 Defendant points out that he is a Negro and contends that the court erred in denying his motion to quash the indictment on the ground that members of his race were

---

[3]Section 686 provides in part: "In a criminal action the defendant is entitled: . . .

"3. To produce witnesses on his behalf and to be confronted with the witnesses against him, in the presence of the court, except that where the charge has been preliminarily examined before a committing magistrate and the testimony taken down by question and answer in the presence of the defendant, who has, either in person or by counsel, cross-examined or had an opportunity to cross-examine the witness; or where the testimony of a witness on the part of the people, who is unable to give security for his appearance, has been taken conditionally in the like manner in the presence of the defendant, who has, either in person or by counsel, cross-examined or had an opportunity to cross-examine the witness, the deposition of such witness may be read, upon its being satisfactorily shown to the court that he is dead or insane or cannot with due diligence be found within the state; and except also that in the case of offenses hereafter committed the testimony on behalf of the people or the defendant of a witness deceased, insane, out of jurisdiction, or who cannot with due diligence, be found within the state, given on a former trial of the action in the presence of the defendant who has, either in person or by counsel, cross-examined or had an opportunity to cross-examine the witness, may be admitted."

[4]Of course, if that witness is subsequently charged as a defendant, his grand jury testimony may be admissible as an admission or confession; and in appropriate circumstances the testimony of any grand jury witness may be admissible for the limited purpose of impeachment by prior inconsistent statements.

systematically and purposefully excluded from the grand jury which indicted him. But a factual basis for this objection was not established. Defendant relies on such decisions as *Patton* v. *Mississippi* (1947) 332 U.S. 463 [68 S.Ct. 184, 92 L.Ed. 76, 1 A.L.R.2d 1286] (see also cases cited at p. 465, fn. 3, of 332 U.S. [92 L.Ed. at p. 78]). As the latter opinion makes clear, however, "Whether there has been systematic racial discrimination by administrative officials in the selection of jurors is a question to be determined from the facts in each particular case." (*Id.* at p. 466.)

Here the record shows that affidavits in support of and in opposition to defendant's motions were filed, and a hearing was held at which evidence was taken. Defendant sought to prove that no Negro had served on a Kings County grand jury since 1893, the year in which the county was organized. The People did not dispute this fact, but introduced evidence based on official census records establishing that in 1960 Negroes constituted only 5.1 per cent of the total population of Kings County, and that prior to World War II the proportion had been 1 per cent or less. It was also shown that Negroes had often served on petit juries in Kings County (and defendant does not complain of the fact that there was no Negro on the jury that tried and convicted him). The county clerk testified that it was her duty to check the proposed grand jury list against the voters' registration affidavits to determine whether any persons therein named were disqualified by statute, but that such affidavits bear no indication as to the race of the voter; she further testified that during her tenure in office (since 1953) no member of the board of supervisors or judge of the superior court had ever requested her to determine the race of a prospective grand juror.

In the course of the hearing on the motion to quash, the trial judge spoke at length on the subject of his method of selecting grand juries since he took office in 1956, and subsequently ordered that such statements be considered as his testimony. He said that in selecting a panel he "always endeavors on each one of those [judicial] districts to get a good cross section of people who will be qualified to serve as Grand Jurors"; that he had consistently "tried to get a distribution of racial descents, tried to get both sexes represented, tried to get occupations, farmer [*sic*], business men and various other types so it will be real—a real representative group of people, of the better type"; and that since 1956

he had not had a Negro on the panel "not through lack of desire, but purely through lack of ability to find one that the Court feels would make a proper Grand Juror." The judge pointed out that he had previously asked defendant's counsel to suggest the names of Negro residents who might be qualified to serve, and had considered selecting a Mr. Lloyd Welcher but declined to do so after determining that the duties would interfere with the latter's regular employment. Finally, it was shown that in Kings County "rarely is any of the grand jury's time devoted to hearing evidence of criminal offenses," and that in the decade ending in 1962 more than 1,000 prosecutions were initiated by information while four were initiated by indictment and only one of the latter was against a Negro.

The foregoing record amply supports the trial court's determination that there was no systematic exclusion of Negroes from the grand jury which indicted defendant. In this respect the case at bench is indistinguishable from and is controlled by our decision in *People* v. *Burwell* (1955) 44 Cal.2d 16, 41-42 [36] [279 P.2d 744], cert. denied, 349 U.S. 936 [75 S.Ct. 788, 99 L.Ed. 1265].

Defendant's remaining contentions—that in several respects the grand jury proceedings were not conducted in accordance with law—have been examined and are so devoid of merit as to require no particular discussion.

By supplemental brief prepared in propria persona defendant contends that evidence was introduced against him which had been illegally seized from his automobile and his hotel room. No objection was interposed on this ground to the admission of any such evidence. Moreover, the record does not provide a factual basis for this contention: none of the items introduced were taken from defendant's room, and Officer Webb testified that a warrant had been obtained for the search of defendant's car.

Having set forth the pertinent part of Justice Schauer's opinion, we now turn to the further contentions of defendant heretofore described. Thus defendant argues that the failure of the police to inform him of his right to counsel and of his right to remain silent renders any statements elicited during his interrogation inadmissible. (*Escobedo* v. *Illinois* (1964) 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977]; *People* v. *Dorado* (1965) *ante,* p. 338 [42 Cal.Rptr. 169, 398 P.2d 361].)

We shall point out below our reasons for concluding that defendant's failure to object to the admissibility of his statements at trial does not bar his present claim; that the court erred in so admitting them; that, although in so doing the court committed error, the admission did not work prejudice under article VI, section 4½ of the Constitution of California.

Following his arrest and incarceration in Kings County jail on March 22, 1962,[5] the police conducted a series of six interviews with defendant. The first two such interrogations took place on the day of the arrest at 2:40 p.m. and 3:40 p.m. respectively. The district attorney was present at these times. The third and fourth interrogations occurred on March 23 and 26 respectively. Defendant's parole officer attended the latter two interviews. Defendant was again interrogated on March 28. The final interrogation between defendant and the police officers transpired during the first week of April. As we have noted, defendant, during these interrogations, gave statements which the prosecution introduced at the trial.

Although defendant did not object at trial to the admissibility of these statements, he is not now barred from urging such inadmissibility. As a general rule the admissibility of evidence will not be reviewed on appeal in the absence of proper objections at trial. (*People* v. *Merkouris* (1956) 46 Cal.2d 540, 558 [297 P.2d 999].) We held, however, in *People* v. *Kitchens* (1956) 46 Cal.2d 260, 262-263 [294 P.2d 17], that the rule did not apply to appeals based upon the admission of illegally obtained evidence in cases in which the trials were conducted prior to *People* v. *Cahan* (1955) 44 Cal.2d 434 [282 P.2d 905, 50 A.L.R.2d 513], which declared such evidence inadmissible.[6] As we stated in *Kitchens*, "A contrary holding would place an unreasonable burden on defendants to anticipate unforeseen changes in the

---

[5]Although the police presumably apprehended defendant for questioning as to the murder, he was booked in Kings County jail on March 22, 1962, as a parole violator. The California Adult Authority, upon notification of defendant's suspected involvement in the crime, issued both an order suspending defendant's parole and a warrant for his arrest authorizing any police officer to detain him for delivery into the custody of the Department of Corrections.

[6]Following the decisions of the United States Supreme Court in *McNabb* v. *United States* (1943) 318 U.S. 332 [63 S.Ct. 608, 87 L.Ed. 819], the federal courts adopted a similar rule, holding that confessions obtained during a period of illegal detention were inadmissible regardless of their voluntariness. (*Gros* v. *United States* (1943) 136 F.2d 878, 880-881; see also *Runnels* v. *United States* (1943) 138 F.2d 346, 347; *United States* v. *Haupt* (1943) 136 F.2d 661, 671.)

law and encourage fruitless objections in other situations where defendants might hope that an established rule of evidence would be changed on appeal. . . .'' (*People* v. *Kitchens* (1956) 46 Cal.2d 260, 263 [294 P.2d 17].) Furthermore, since any objection prior to the United States Supreme Court's decision in *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977], ''would have been futile, and 'The law neither does nor requires idle acts'(Civ. Code, § 3532)'' (*People* v. *Kitchens* (1956) 46 Cal.2d 260, 263 [294 P.2d 17]), defendant is not barred from raising the issue of admissibility of this evidence on appeal.

The trial court committed error in admitting the statements. Nothing in the record indicates that the police informed defendant of his rights to counsel and to remain silent or that he otherwise waived those rights. The police obtained the statements during the accusatory stage since, at the time defendant uttered them, he was under arrest and the police were engaged in a process of interrogations that lent itself to eliciting incriminating statements. (See *People* v. *Stewart* (1965) *ante,* p. 571 [43 Cal.Rptr. 201, 400 P.2d 97].) Consequently the admission of these statements at the trial constituted error under *Escobedo* v. *Illinois, supra,* and *People* v. *Dorado, supra.*

The statements, however, did not constitute a confession, deemed to be prejudicial per se (*People* v. *Dorado* (1965) *supra,* at pp. 356-357) ; we therefore examine the record to determine if the introduction of the statements caused prejudice to defendant under article VI, section 4½ of the California Constitution. We do not believe such prejudice occurred.

Defendant did not, during the interrogations, confess or admit any connection with the crime; indeed, the substance of the introduced statements, if believed by the jury, would have exonerated him from guilt. Defendant stated that he did not know any members of the victim's family and that he did not enter the victim's home or molest the girl. Although he stated that the quarter boots introduced into evidence were his, he denied that Fritz Crawford had repaired them. He stated that the gloves found in the weeds where the car had been observed were not his; he denied purchasing black red-lined gloves from Correll Hicks and denied that he knew Hicks. He admitted that he owned a belt which he used to hold up his hip boots but denied that the belt found near the gloves belonged to him. He denied parking his car in Tome Lane on March 21, 1962, or at any other time.

Moreover, the substance of defendants' statements during the interrogation with reference to his activities and whereabouts on the evening of March 21, 1962, was not only exculpatory but also virtually identical with defendant's explanation at trial. Almost every aspect of defendant's alibi was disproved by clear and abundant independent evidence. Any inconsistencies between defendant's testimony and his prior statements were therefore of minor import when viewed in light of the other overwhelming evidence of guilt. Since there is no reasonable probability that the jury would have reached a result more favorable to defendant if the statements had been excluded, we conclude that the judgment as to guilt must be affirmed. (Cal. Const., art. VI, § 4½; *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

In the penalty phase of the trial the judge instructed the jury that "In the event the defendant . . . is sentenced to life imprisonment, he has the opportunity at the conclusion of seven calendar years to be considered for parole." He further advised the jury that they "may, in exercising [their] discretion to choose between different punishments, consider as a possible consequence that the law of this state provides that a defendant sentenced either to death or life imprisonment may be pardoned or have his sentence reduced by the Governor and that a prisoner serving a life sentence may be eligible for parole. A trial judge may also reduce the penalty from death to life imprisonment." The trial court erred in giving these instructions (*People* v. *Morse* (1964) 60 Cal.2d 631 [36 Cal.Rptr. 201, 388 P.2d 33]).

Moreover, the prosecutor, in his argument to the jury, stated that the jury may "wish to consider also that a defendant sentenced to life imprisonment has the chance at the conclusion of seven calendar years . . . [to] be considered for parole." The court erroneously overruled defendant's objection to this line of argument. (*People* v. *Morse, supra,* 60 Cal.2d at p. 652.) We have held the above errors in the penalty trial to be necessarily prejudicial. (*People* v. *Hines* (1964) 61 Cal.2d 164 [37 Cal.Rptr. 622, 390 P.2d 398].)

The judgment is reversed insofar as it relates to the death penalty. In all other respects the judgment is affirmed. Defendant is remanded to the custody of the Superior Court of Kings County for a new penalty trial.

Traynor, C. J., Peters, J., and Peek, J., concurred.

SCHAUER, J.*, Concurring and Dissenting.—I concur generally in the opinion insofar as it relates to the issue of guilt. I do not agree that the trial court erred in admitting in evidence statements made by defendant prior to the trial. Such statements were properly admitted because (1) there is no showing that they were coerced; (2) they appear to have been voluntarily made; (3) they purported to be exculpatory as to the crime for which defendant has been convicted and, hence, intended to benefit him. Furthermore, assuming for the purposes of this decision that there was error in admitting the statements, I concur in the majority's holding that the receipt in evidence of those statements does not support a finding or conclusion by us "after an examination of the entire cause, including the evidence, . . . that the error complained of has resulted in a miscarriage of justice."

However, I must challenge the language of the majority as avoiding, rather than meeting, the constitutional issue on the penalty phase of their opinion. On this aspect of the case they declare: "[W]e find that the rendition of instructions identical to those condemned in *People* v. *Morse* (1964) 60 Cal.2d 631 [36 Cal.Rptr. 201, 388 P.2d 33], coupled with the presentation of certain arguments to the jury necessarily worked prejudicial error. (*People* v. *Hines* (1964) 61 Cal.2d 164 [37 Cal.Rptr. 622, 390 P.2d 398])." The opinion adds "We have held the above errors in the penalty trial to be necessarily prejudicial," and again cites the *Hines* case.

Whether the admission of any particular item of evidence or the giving of any certain instruction, or permitting a certain argument, did or did not "work prejudice" or "prejudicial error" is not a test upon which we may resolve the issue as to affirmance or reversal of a judgment. Every item of evidence introduced in the trial and every instruction given or argument made may have tended to "prejudice" the defendant; i.e., to lend some support for the ultimate verdict. Our Constitution (section 4½, clarifying and limiting section 4 of article VI, as made clear by the circumstances preceding and surrounding its adoption on October 10, 1911, in its then form applicable only to criminal case appeals) peremptorily forbids this court to reverse for mere *error* "as to any matter of pleading, or . . . procedure," *whether prejudicial or otherwise,* "*unless,* after an examination of the entire cause, including the evidence, the court shall be of the opinion that

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

*the error complained of* has resulted in a miscarriage of justice." (Italics added.)

Manifestly, no error would be complained of unless it were deemed to be prejudicial. But being prejudicial is not the test for the serious business of reversal of a judgment. Error, prejudicial or otherwise, is in itself inconsequential and must be disregarded *unless* "after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." Surely it is not seriously disputed that the last quoted language relates to "the entire cause including the evidence" *in the case which is under review,* not to any other case which may have been previously decided. The citations of the rulings in *Morse* and *Hines* add nothing to the "entire cause including the evidence" now before us. What the majority found in *Hines* or *Morse* is wholly immaterial to the "entire cause including the evidence" upon which alone the case now here must be decided.

Assuming for the purposes of this concurring and dissenting opinion that it was error to admit in evidence certain of defendant's statements said to be obnoxious to *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977], and/or *People* v. *Dorado* (1965) *ante,* p. 338 [42 Cal.Rptr. 169, 398 P.2d 361], I concur in the holding that "Since there is no reasonable probability that the jury would have reached a result more favorable to defendant if the statements had been excluded, we conclude that the judgment as to guilt must be affirmed. (Cal. Const., art. VI, § 4½; *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)"

Upon precisely the same compelling constitutional mandate and the same decision construing it, supported further by *People* v. *Morse* (1964) *supra,* 60 Cal.2d 631, 652-653, I am regretfully compelled to dissent from what appears to me to be an incongruity in an otherwise scholarly and generally excellent opinion.

In all the majority opinion there is no suggestion that there is any doubt whatsoever as to the guilt of this defendant, or the justness of the verdict. How then could the majority solemnly hold that the *verdict* in this case works a miscarriage of justice? Absent that holding, the *reversal* works a miscarriage of justice.

All the facts, all the law, all of the reasons which overwhelmingly support affirmance of the finding of guilt, likewise—and even more imperatively for the cause of justice

—demand affirmance of the judgment imposing the most effective deterrent known to our law: the death penalty. And prompt execution of that penalty, without further delay-sapping of its deterrent effect on potentially murder-capable but still vacillating persons of the type of this defendant, is far more important to *those persons themselves* as well as to other 15-year-old girls—and their families—and to law enforcement in California—than is any proffered basis for the strained reversal, which can benefit—if the word be loosely used—only this defendant and others who have committed or are contemplating the pros and cons of similar crimes.

The judgment should be affirmed in its entirety.

McCOMB, J.—I concur with the affirmance of the judgment in its entirety.