[Crim. No. 8836.   Second Dist., Div. Two.   July 20, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. FRANK ALEX DU BONT, Defendant and Appellant.

Burton Marks for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Rose-Marie Gruenwald, Deputy Attorney General, for Plaintiff and Respondent.

ROTH, P. J.—Appellant was by information charged in two counts, Count I: burglary (Pen. Code, § 459); Count II: receiving stolen property (Pen. Code, § 496). He was found not guilty by the court on Count I and guilty on Count II. He appeals from the judgment.

The record shows that appellant had been a police officer for 11½ years and was prior to and at the time of his arrest a licensed bail bondsman.

On this appeal appellant's primary contention is that the evidence was insufficient to establish the requisite element of knowledge that the goods in his possession were stolen. The evidence on this point was largely circumstantial. However, because of the nature of the crime "Direct evidence of knowledge is seldom possible, and the proof is usually circumstantial. . . ." (1 Witkin, Cal. Crimes (1963) 395.)

On May 8, 1962, sometime after 8 p.m., Electrofilm, Inc. in North Hollywood, was burglarized and office equipment, including a Remington electric typewriter, and an adding machine were stolen. The typewriter was valued at $490 and the adding machine was valued at $220.

On or about May 8 or May 9, appellant went to the apartment of one Joe Levin to discuss the possibility of going to work for Levin. He told Levin that he had a typewriter, adding machine and television set in his car and that the items were for sale; that he had obtained the three items from a client of his, "an attorney that went bankrupt, or something, . . ." Levin asked appellant if the items were stolen and appellant said no. Levin bought the three items for $240. He paid appellant $100 at that time, another $100 a few days later. The balance was owed.

Levin asked for a bill of sale and was told by appellant that he would get it as soon as appellant received one from the person who had given him the items. On May 20, Levin again asked for the bill of sale, and was told by appellant "come back tomorrow night and I will have your bill of sale here definitely."

On May 22, 1962, the police interviewed appellant at his office after picking up the typewriter and adding machine from one Irwin Kane, who had bought them from Levin. At the interview appellant first denied selling anything to Levin, but then admitted to the officers that he had sold the items described to Levin and had told Levin the story about receiving the items from a bankrupt attorney but that he had really received them from a man by the name of Fitzgerald who had called him three to five weeks prior to May 22, to

inquire whether he wanted to buy a typewriter; that Fitzgerald, who had a telephone answering service, had gone bankrupt and had office equipment for sale. Appellant stated further that on the afternoon of May 8, Fitzgerald drove up to his office with the three items and agreed that appellant should try and sell them for $175. He never told Fitzgerald who he was selling the items to and gave Fitzgerald the $200 received from Levin at a later time.

After the interview recounted above, appellant produced a typewritten receipt he said he had received two weeks previously which stated, "Received of J.E.O. Levin. $240 for used as is television, Remington typewriter, and adding machine." The receipt was dated May 4, 1962, and signed "Mr. J. Fitzgerald."

The officers asked appellant if he had another typewriter in his office and appellant went into a back room and brought out a portable typewriter. One of the officers saw another typewriter in the backroom, a Tower, which was brought out and tested. The officers were of the opinion that it was the same typewriter that had typed the receipt from Fitzgerald. When first asked how long he had had the Tower, appellant replied, two weeks. When the exemplar from the Tower was shown to appellant, he told the officers that he had received the Tower from Fitzgerald "two days before." Levin also testified that he had seen the Tower typewriter in appellant's office on May 11.

The officers asked appellant where they could find Fitzgerald, and appellant replied, " 'I don't know.' I says, [sic] 'Well, do you know his business address,' and he said, 'No.' 'Do you know his home address?' And he said, 'No.' 'Do you know where we can phone him?' And he said, 'No.' 'Is there any way, any information that you can give us that will lead us to Mr. Fitzgerald?' And he says, 'No, I just have to wait until he contacts me.' "

Following the interview at appellant's office, he was taken to an interrogation room at the North Hollywood police station where he was again interrogated and in substance repeated the same story he had previously given. This time the conversation was tape-recorded.

Appellant testified on his own behalf that Fitzgerald was a man he had seen around approximately two and one-half to three years; that Fitzgerald had left the three items at his office on May 8 or 9 and had left the receipt, which appellant never looked at, on appellant's television set while appellant was out of the office. This was observed by the lady next door

who was in Maryland at the time of the trial. Appellant testified further that he did not attempt to ascertain if the items were stolen but that he checked with the Remington Company to see if any money was owed on the typewriter. Appellant also testified that his financial arrangements with Fitzgerald were not definite.

On cross-examination, appellant testified that he tried to find Fitzgerald at several bars from which Fitzgerald had in the past called appellant, but was unsuccessful; that he did not tell the police in subsequent conversations that Fitzgerald could be located at these bars; and that it was daylight, probably around noon, when Fitzgerald brought the three items to his office.

Appellant's story remained substantially consistent throughout the entire course of the above related events beginning with the police interrogation on May 22, 1962, and ending with his testimony at the trial, August 24, 1962.

█ It is well settled that the possession of recently stolen goods accompanied by no explanation (but see *People* v. *Dorado*, 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]) an unsatisfactory explanation or by suspicious circumstances, will justify an inference that the goods were received with knowledge that they had been stolen. (*People* v. *Lyons*, 50 Cal.2d 245 [324 P.2d 556]; *People* v. *McFarland*, 58 Cal.2d 748 [26 Cal.Rptr. 473, 376 P.2d 449]; *People* v. *Lopez*, 126 Cal.App.2d 274, 278 [271 P.2d 874].) █ In addition, failure to show that possession was honestly obtained is itself a strong circumstance indicating guilt. (*People* v. *Citrino*, 46 Cal.2d 284, 288 [294 P.2d 32].) █ This latter rule does not shift the burden of proof. It merely allows the inference of guilt to be drawn. (*People* v. *McFarland, supra*, p. 756.)

█ Appellant's possession soon after the theft, the sale thereof for a grossly inadequate price, the acquisition of the goods from the questionable and elusive Fitzgerald; failure to produce Fitzgerald or satisfactorily explain his failure to do so, combined with the evidence of the exemplar taken from the Tower typewriter found in appellant's possession and his contradictory and evasive statements to the police, were in their totality sufficient to establish that consciousness of guilt requisite to a finding that appellant had knowledge that the property herein described was stolen.

The trial here under review was held pre-*Dorado*. The record does not show that appellant was advised at any time of his right to counsel or to remain silent, or that he effectively waived either of those rights. In oral argument appellant

urged that the *Dorado* rule applies to the statements and admissions heretofore recounted and made by appellant to the police officers. ▮ In our opinion the interview between appellant and police at appellant's office was during the period when the officers were investigating the crime, and therefore, are not within the *Dorado* rule. ▮ The taped interview at the Hollywood police station was had, however, at a time when responsibility for the crime had focused on appellant and it was within the *Dorado* rule. The introduction of this taped interview was error.

However, none of the statements or admissions made by appellant at the police station were in the nature of confessions. Appellant in the interview at his office and in the interview at the police station maintained his innocence throughout. The introduction in evidence of the taped interview was not, in our opinion, of such a nature as to constitute prejudicial error requiring reversal. (*People* v. *Dorado, supra,* 62 Cal.2d 338, 356; *People* v. *Hillery,* 62 Cal. 2d 692, 712 [44 Cal.Rptr. 30, 401 P.2d 382]; *People* v. *Erb,* *(Cal.App.) 43 Cal.Rptr. 111.)

On two different occasions, the first prior to rendering judgment, and the second upon the motion for new trial, the trial court voiced its opinion that defendant's story was unbelievable.

▮ The trier of fact is the sole judge of the credibility of the witnesses and of the weight to be afforded the testimony of each. (*People* v. *Newland,* 15 Cal.2d 678 [104 P.2d 778].) ▮ The trier of fact may reject any part of a witness' testimony and give credence to other portions. (*People* v. *Bodkin,* 196 Cal.App.2d 412, 414 [16 Cal.Rptr. 506].) ▮ The presumption on appeal is in favor of the judgment, carrying with it all favorable inferences. ▮ In light of the trial judge's statement we do not think it reasonably probable that a result more favorable to appellant would have been reached but for the error. (*People* v. *Watson,* 46 Cal.2d 818, 836 [299 P.2d 243].)

▮ Appellant contends finally that since he did not ". . . vary from the story as to how he had acquired the merchandise" nor did he waiver from his statement of lack of knowledge of the stolen character of the property and since he had given a description to the police of Fitzgerald, that it became the duty of the police to search for and find

*A rehearing was granted in *People* v. *Erb* on April 2, 1965. The final opinion is reported *ante,* p. 650 [45 Cal.Rptr. 503].

Fitzgerald. The failure of the police so to do, he argues, amounts to a suppression of evidence, and that ''The intentional suppression of material evidence . . . [amounts to] a denial of a fair trial and due process . . . .'' (*People* v. *Kiihoa,* 53 Cal.2d 748, 752 [3 Cal.Rptr. 1, 349 P.2d 673]; *Brady* v. *Maryland,* 373 U.S. 83, 87 [83 S.Ct. 1194, 1196, 10 L.Ed.2d 215, 218].)

There is no evidence even remotely squinting at the fact that the police knew Fitzgerald or his whereabouts, or had at any time had any contact with him. On the contrary, the record indicates that the police did not, nor did the court place any credence on the statement that such person existed or that such person had any connection with the crime. The facts of this case do not lend themselves even remotely to the conclusion that there was any wilful suppression of evidence on the part of the police. Further, we are of the opinion that there is nothing in the *Kiihoa* rule which placed an affirmative duty on the police to find Fitzgerald or anyone else that appellant might have identified as being able to corroborate a statement made by appellant. (*People* v. *Brooks,* 234 Cal.App.2d 662, 678 [44 Cal.Rptr. 661].)

The judgment is affirmed.

Fleming, J., concurred.

Herndon, J., concurred in the judgment.

A petition for a rehearing was denied August 10, 1965, and appellant's petition for a hearing by the Supreme Court was denied September 15, 1965.