[Crim. No. 19759. Second Dist., Div. One. Oct. 8, 1971.]

THE PEOPLE, Plaintiff and Respondent, v. SAMUEL LAX, Defendant and Appellant.

COUNSEL

Patrick Coleman for Defendant and Appellant.

Evelle J. Younger, Attorney General, Charles P. Just and James M. Monty, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

LILLIE, J.—Defendant was charged with pandering (§ 266i, Pen. Code) and the information alleged two prior felony convictions (violations §§ 476a and 484a, subd. (b), Pen. Code). The cause was submitted on the transcript of the testimony taken at the preliminary hearing and defendant was found guilty as charged. His motion for new trial was denied but the offense was declared a misdemeanor pursuant to section 17, Penal Code.

Defendant, who was engaged in various businesses, had several accounts at a bank at which Dianna worked as a teller and came there regularly three or four times a week; on one occasion he gave her his card and told her if she was ever interested in working for him to let him know. About three weeks later (March 1970) Dianna called him; defendant was not in

but returned her call that evening; she told him she was looking for another job but he told her he would rather not talk about it over the phone. Later they discussed the matter at a restaurant. She said she was dissatisfied with her job and would like to make more money; defendant told her, "I don't know how you would fit into the organization I have because I don't know how you feel about, what your mores are, what your ideas are, and what you want out of life," and "a lot of people prostitute themselves in different ways every day and to be paid for being good is no shame." They had several other meetings at which they talked about his businesses and the people who worked for him, the last of which occurred at defendant's place of business at which Cheryl (Sherry) King, defendant's secretary and a codefendant, was also present. He told her he had a girl working for him, "a prostitute" named Jet, he only sent people he knew to her and received some compensation for them but he would prefer to have somebody on his own so that he would not have to split commissions. Defendant specifically told her he wanted her "to engage in acts of prostitution for him"— "It was laid out what my responsibilities would be either on a part-time or however it happened to work out best for them [defendant and King] at that time." The court then asked Dianna, "And what did [defendant] say your job would be?" and she answered, "He said they [defendant and King] needed somebody to be a piece of ass for them." Then she was asked by defense counsel, "After Mr. Lax made this statement to you, did you ask him what he meant by it?" and she replied, "No, sir. I'm well aware what he meant by it. . . . I understood in his vernacular how he meant it and the connotation with which he said it, was, that I was to work in the capacity where I would prostitute myself for men or [sic] compensation. . . . He said, 'We will have to get you new clothes and set you up in an apartment and work it out from there because we all work together.'" Dianna told defendant she didn't believe she could be a prostitute and nothing else; he said it would not have to be full time but could be on an occasional basis "whatever the going price was, if it was worth the money," and a prostitute could make $40,000 a year and would not have to stand in the street. She agreed to take the job as she felt she knew too much about defendant's business and financial dealings to back out; asked if she was afraid of defendant, she answered, "I'm not afraid of him; maybe of the influence he has, but him personally, no," but he did tell her what he could do to her through himself or through friends. Defendant asked her if she knew how to check out a man and she said, "No"; he told her that since she really didn't know anything (about prostitution) she would have to be with somebody for a while to "learn the trade," he would set up the arrangements and that person would be Jet; he said she should wear good jewelry and they had some on the premises (a jewelry establishment

was one of the facets of defendant's business). Cheryl asked if she wanted to move in that night and she said she did; defendant told her to go home and get packed. Cheryl helped her pack and she moved her clothing into Cheryl's apartment, but stayed only four or five hours; after talking with her mother, brother and husband she decided to return home.[1] Dianna said she moved into Cheryl's apartment that night because she was having marital problems but when asked if there was any other reason she replied, "Well, at the time, perhaps I testified before, I felt not only was I having trouble with my husband, but I felt, too, I knew entirely too much about the thing and about things that were going on.

"And also I felt if they wouldn't use me in this line of work since it wouldn't be a permanent [job]—since he wouldn't use me in this line of work. . . . It wouldn't affect my mores to be a secretary or that type of thing. In other words, if [prostitution] wasn't going to be my sole purpose in being there, then I would move down with her."

Defendant denied he ever solicited Dianna to have intercourse with anyone or made arrangements for her to work for him; testified he did tell her he might be able to find secretarial or other type of work for her and there was a possibility he might be able to employ her and admitted he discussed prostitution and had intercourse with her.

The sole issue is the sufficiency of the evidence to support the judgment of conviction. Appellant argues that there is no showing Dianna was either "procured" or "placed as an inmate of a house of prostitution"; there is no evidence from which "this court could conclude beyond a reasonable doubt" that he committed the crime in that there is no proof of any purported offers by him to secure money for Dianna for the performance of sexual services or that he proposed any form of sexual activity; and the evidence can as well be interpreted to mean that he and Cheryl King sought "a flashy, showy, sexually attractive young woman in their business operations" instead of a prostitute, or that he was desirous of having consensual relations with her himself.

■ It is the trier of fact not the appellate court that must be convinced of defendant's guilt beyond a reasonable doubt. (*People* v. *Hillery,* 62 Cal.2d 692, 702 [44 Cal.Rptr. 30, 401 P.2d 382].) ■ This court must view the evidence in a light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce

[1]On September 17, 1970, shortly before defendant's arrest, Dianna aided the police in recording a conversation she had with him; the recording was played at the trial but not transcribed.

from the evidence. (*People* v. *Reilly,* 3 Cal.3d 421, 425 [90 Cal.Rptr. 417, 475 P.2d 649]; *People* v. *Sweeney,* 55 Cal.2d 27, 33 [9 Cal.Rptr. 793, 357 P.2d 1049].) ■ ■ "If the circumstances reasonably justify the trial court's findings, reversal is not warranted merely because the circumstances might also be reasonably reconciled with a contrary finding. (*People* v. *Robillard,* 55 Cal.2d 88, 93 [10 Cal.Rptr. 167, 358 P.2d 295, 83 A.L.R.2d 1086]; *People* v. *Love,* 53 Cal.2d 843, 850-851 [3 Cal.Rptr. 665, 350 P.2d 705].) The test on appeal is whether there is substantial evidence to support the conclusion of the trier of fact; it is not whether guilt is established beyond a reasonable doubt. (*People* v. *Hillery,* 62 Cal.2d 692, 702-703 [44 Cal.Rptr. 30, 401 P.2d 382].)" (*People* v. *Redmond,* 71 Cal.2d 745, 755 [79 Cal.Rptr. 529, 457 P.2d 321]; *People* v. *Williams,* 5 Cal.3d 211, 214 [95 Cal.Rptr. 530, 485 P.2d 1146].) ■ Before the judgment of the trial court can be set aside for insufficiency of the evidence to support the verdict of the jury, it must clearly appear that upon no hypothesis whatever is there sufficient substantial evidence to support it. (*People* v. *Daugherty,* 40 Cal.2d 876, 885 [256 P.2d 911]; *People* v. *Redmond,* 71 Cal.2d 745, 755 [79 Cal.Rptr. 529, 457 P.2d 321].)

The material allegations of the information charged defendant with "the crime of PANDERING, in Violation of Section 266i, Penal Code," in that he "did willfully, unlawfully and feloniously procure Diana [*sic*] Duncker, a female person, a place as an inmate of a house of prostitution." Section 266i, Penal Code, defines the offense of pandering and in part provides: "Any person who: (a) procures another person for the purpose of prostitution; or (b) by promises, threats, violence, or by any device or scheme, causes, induces, persuades or encourages another person to become a prostitute; or (c) procures for another person a place as inmate in a house of prostitution or as an inmate of any place in which prostitution is encouraged or allowed within this state . . . is guilty of pandering, a felony. . . ."

■ The subdivisions of the foregoing statute do not state different offenses but merely define the different circumstances under which the crime of pandering may be committed. ■ "The commission of any one of the acts described in the foregoing code section constitutes the offense of pandering; may involve the commission of other acts separately described therein; and, for this reason, a description of the one act may include the others. (*People* v. *Montgomery,* 47 Cal.App.2d 1, 23-26 [117 P.2d 437].)" (*People* v. *Charles,* 218 Cal.App.2d 812, 816 [32 Cal.Rptr. 653].) ■ While there may be some doubt on the record before us that Cheryl's apartment was "a house of prostitution" within the meaning of subdivision (c) of the statute, there is no doubt whatever in light of the foregoing appellate rules that the evidence which established that defendant "procured"

Dianna (subd. (c)) also clearly establishes that by promises he encouraged her to become a prostitute, an act proscribed by section 266i, subdivision (b). ■ "The statute endeavors 'to cover all the various ramifications of the social evil of pandering and include them all in the definition of the crime, with a view of effectively combating the evil sought to be condemned.' (*People* v. *Montgomery, supra,* 47 Cal.App.2d 1, 24.)" (*People* v. *Charles,* 218 Cal.App.2d 812, 816 [32 Cal.Rptr. 653].)

■ While the proof establishes a violation of section 266i, subdivision (b), there is no indication whatever that defendant was prejudiced by any variance between the evidence and the description of the offense in the information couched in the language of subdivision (c). Neither subdivision (b) nor (c) of section 266i was specifically designated in the information, but defendant had notice he was charged with "PANDERING, in Violation of Section 266i" from the information (*People* v. *Washington,* 17 Cal.App.3d 470, 474 [94 Cal.Rptr. 882]) and from the transcript of the testimony taken at the preliminary hearing on which he submitted the cause to the trial court; too, he knew what he had to defend against and made his defense accordingly; and at no time has he ever claimed he was misled or inadequately informed of the charge. ■ "The test of the materiality of a variance is whether the indictment or information so fully and correctly informs the defendant of the criminal act with which he is charged that, taking into consideration the proof which is introduced against him, he is not misled in making his defense, or placed in danger of being twice put in jeopardy for the same offense." (*People* v. *LaMarr,* 20 Cal.2d 705, 711 [128 P.2d 345]; *People* v. *Collins,* 54 Cal.2d 57, 60 [4 Cal.Rptr. 158, 351 P.2d 326].)

The judgment is affirmed.

Wood, P. J., and Clark, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied December 16, 1971.