Filed 9/30/16  P. v. Middleton CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

THE PEOPLE,

    Plaintiff and Respondent,

v.

DEMETRIUS RAY MIDDLETON,

    Defendant and Appellant.

E063416

(Super.Ct.No. FWV1302817)

OPINION

APPEAL from the Superior Court of San Bernardino County.  Gregory S. Tavill, Judge.  Affirmed.

Richard Schwartzberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr., and Stacy Tyler, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Demetrius Ray Middleton appeals from his convictions for pimping and pandering. Defendant contends the trial court erred by denying his request during trial to discharge his retained counsel, and that the evidence was insufficient to support his conviction for pandering. We find no error and, therefore, we affirm the judgment.

I.

FACTS AND PROCEDURAL BACKGROUND

In a felony complaint, the People charged defendant with one count of pimping (Pen. Code, § 266h, subd. (a), count 1; all additional undesignated statutory references are to the Penal Code) and one count of pandering (§ 266i, subd. (a)(1), count 2). Defendant waived his right to a preliminary examination, and the People filed an information alleging the same two counts of pimping and pandering.

A.     *Prosecution Evidence*.

Defendant checked into the Fairfield Inn in Ontario for a three-night stay. Defendant booked a room with two queen beds. At check-in, defendant started to pay for the room with a credit card, then paid in cash. Defendant added a guest named "Allison Fontain" to the room.

Two days later, officers with the Ontario Police Department's vice and narcotics team received a report from the Fairfield Inn about suspected prostitution in room 111. A hotel clerk reported several men coming and going from the room. The officers searched for prostitution advertisements using the names of the guests registered to the room, and found advertisements for a female using the name "Ari" on myredbook.com and

2

backpage.com, paid Internet networking sites that host, among other things, adult advertisements for escort and prostitution services.

The backpage.com advertisement had the sexually suggestive title, "Young, discrete and blond, tight and pink," and offered sexual services in "Upscale Ontario" near the airport. The advertisement offered "CFS rates only"; CFS stood for "covered full services," meaning oral and vaginal intercourse with a condom. The advertisement also had a price list of $150 for half an hour and $260 for a full hour. The myredbook.com advertisement was more sexually explicit and included a photo of a woman orally copulating a man. It advertised "call-in" sexual services in "Five Star Ontario" including "the ultimate GF experience," meaning "girlfriend" service without a condom for a higher fee. The advertisement had a price list of $100, $150, and $250.

Using the photos of "Ari" from the advertisements, the officers were able to identify the woman from her Department of Motor Vehicles (DMV) photo. The officers then set up surveillance around the Fairfield Inn while an undercover officer tried to arrange a "date" with the woman.

Undercover Officer Estrada called "Ari" on the phone and asked if they could meet. The woman said she charged $150 for a half-hour "special," and that "Greek" or anal sex would cost an extra $80. The two agreed to meet in Ontario. The woman spoke in a monotone voice and seemed uninterested in the conversation, which the officer thought was unusual because prostitutes are normally flirtatious and extra friendly to make sure the client shows up. Estrada also heard a male voice in the background who appeared to be giving the woman directions over the sound of loud music. Ten or 15

minutes later, Estrada called the woman back and was told to meet at the Fairfield Inn. After arriving at the hotel, Estrada called the woman again and was told to wait a few minutes while she got ready. The woman sounded emotional, as if she had been crying. Finally, the woman called Estrada back and told him to go to room 111.

A backup team of officers was surveilling the hotel and lobby from various places in the parking lot. Estrada called the backup team and told them he had arranged a date in room 111, that the woman was on her way back to the hotel, and that he heard a male voice and loud music in the background. Shortly thereafter, a white vehicle pulled up to the hotel with its windows down and loud music coming from inside the vehicle. Defendant was driving, and a white female was in the front passenger seat. The female got out of the vehicle, followed shortly by defendant. After Estrada received the room number, defendant got back into the vehicle and drove away; an officer in an unmarked police vehicle then followed defendant.

Estrada and Detective Crittenden approached room 111, and Estrada knocked on the door. A woman answered the door and said she was "Ari." Estrada recognized her face from the backpage.com and myredbook.com advertisements, and identified her as Allison LaFountain. Estrada also noticed that LaFountain tried to hide her face, and when Estrada grabbed her hands he saw that LaFountain's face was red and swollen, and that she had been crying. Estrada, Crittenden, and the backup team then entered and searched the room. They found condoms, a pipe for smoking methamphetamine, some men's clothing, two cellular phones, a tablet computer, and less than $20 in cash. The officers also discovered a notebook that had "my rates" and other prostitution

4

terminology printed in it, notes of male names, the service and amount of time they spent, and the amount of money they paid. The notebook also contained an account number, password, and email addresses for a myredbook.com advertisement. A piece of paper found inside the notebook had the name Demetrius Ray Middleton, the alias "DJ Phantom" followed by the dollar sign, and "Daddy" printed on it.

Estrada confirmed that one of the cellular phones found in room 111 was the one LaFountain used to arrange the date. The phone showed the number Estrada used to call and arrange the date, and had a contact number under the name "Daddy" with dollar signs around it. "Daddy" is a name commonly used by prostitutes for their pimps. Estrada concluded LaFountain was engaged in prostitution, and she was placed under arrest.

Crittenden then called Investigator Carbaugh, who was now where the officer in the unmarked police vehicle had stopped defendant's vehicle. Carbaugh recovered an iPhone when defendant was placed under arrest. Carbaugh called to tell Crittenden that he had recovered a cellular phone from the vehicle. Crittenden then called the number for "Daddy," using the phone he recovered from the room, and Carbaugh answered on the iPhone. Before defendant's vehicle was impounded, defendant told Carbaugh that he had a large sum of currency in various places inside the vehicle. Carbaugh recovered $7,360 in cash from the vehicle. During booking, an additional $360 in cash was found in defendant's pocket.

The police obtained a search warrant for records related to the advertisements on backpage.com. The records showed that advertisements tied to the email address exoticbadbabe@yahoo.com was posted multiple times on backpage.com between

July 12 and August 15, 2013.  Invoices for the backpage.com advertisements contained the names "Demetrius M.," Demetrius Middleton and "Phantom"; various real and fake addresses in Stockton; and a phone number that matched the number written on defendant's booking sheet for his employer.

A forensic examination of LaFountain's cellular phone revealed activity related to the myredbook.com advertisement.

Crittenden provided expert testimony on human trafficking and pimping.  He testified that pimps exert control over their prostitutes through physical and mental coercion.  A pimp may exert mental coercion and intimidation over the prostitute in a number of ways, including making the prostitute dependent on the pimp and threatening to tell the prostitute's family that she is prostituting herself.  Some pimps are "compassionate," meaning they care for and never hurt the prostitute, and pay for the prostitute's clothing and food.  Another way of controlling a prostitute is for the pimp to isolate her from the area she is familiar and comfortable with, and make her work as a prostitute in an area she does not know and where she has nobody to contact.  Many prostitutes are told not to touch the money that is paid to them by clients, and that only the pimp can handle the money.  Pimps often have their prostitutes work a "circuit," meaning they move the prostitute from city to city, including from state to state, to avoid being arrested and to build a base of clientele.

B.    *Defense Evidence*.

Defendant met LaFountain in Stockton, and the two exchanged phone numbers. After staying in Southern California and working in the Los Angeles area for a couple of months pursuing a music career, defendant called LaFountain to find out how she was doing. LaFountain had previously told defendant that she used drugs. LaFountain was hysterical and irate when defendant spoke to her. Defendant told LaFountain to book a train ticket to come down from Stockton, and he booked a hotel room for her. Defendant told LaFountain to come to Southern California to help her quit drugs. Defendant picked LaFountain up and took her to the hotel he was staying in. Defendant paid for LaFountain's hotel room. He and LaFountain did not have a physical relationship at first, and he took care of her "out of the kindness of [his] heart." Over time, the two began to develop feelings for each other and the relationship became physical. Defendant would leave LaFountain alone "[a]ll the time." LaFountain was free to do whatever she pleased, and she could have left whenever she wanted to.

LaFountain had been prostituting herself in Stockton, but at first defendant did not know she was also prostituting herself in Southern California. Defendant did not have sex with LaFountain for money when she was prostituting herself in Stockton. Defendant learned that LaFountain was prostituting herself about three months after she came down from Stockton to Southern California. Defendant searched Google for LaFountain's phone number, and to his "astonishment" found advertisements LaFountain had posted.

Defendant rented a room for himself and LaFountain at the Fairfield Inn while he worked on his music in San Bernardino. On the evening he was arrested, defendant drove to a mall to purchase clothing for LaFountain. The two had an argument because LaFountain was unhappy with the purchases, so they both drove back to the mall. On the way back to the hotel, LaFountain received a phone call. Defendant asked LaFountain who had called, but received no answer. Defendant and LaFountain arrived back at the hotel, and the two went to room 111.

While inside the room, LaFountain received another phone call. Defendant then left the hotel to drive to a restaurant and was pulled over by the police. The officers handcuffed defendant and searched his vehicle. Defendant told the officers that he had money inside the vehicle, but that about $1,500 of the money found in the vehicle belonged to LaFountain. Defendant assumed LaFountain earned the money prostituting herself. Defendant did not agree with LaFountain prostituting herself, but stated, "I don't judge." Defendant was asked if the money LaFountain gave him "was . . . in payment for any work [defendant] did for her?" Defendant responded, "No." Defendant testified women often called him "Daddy," and that the name had nothing to do with pimping or prostitution.

Defendant explained the meaning of some text messages found on LaFountain's phone. He stated, "I didn't agree with her decisions but I made sure she was safe about it." LaFountain had sent defendant a text message after a client left the room, which read, "He just left. 350 daddy." Defendant responded, "Fo sholey," followed by an exclamation point, and "I'm a repost." Defendant explained he was excited for

8

LaFountain that she was earning her own money, even though it came from prostitution. LaFountain texted defendant various other times during the day to let him know she had arranged dates and when the men left the room.

The addresses on the invoices for LaFountain's online advertisements were to a house in Stockton where defendant's parents used to live and a Stockton residence where defendant used to live. Defendant denied that he posted any of the advertisements. Defendant testified the email address exoticbadbabe@yahoo.com and the phone number that were used for the backpage.com advertisement were not his. LaFountain had access to defendant's phone and to his contacts, including his father's phone number and business address.

After he was arrested, defendant asked his father to contact LaFountain and to get her to a safe place. Defendant's father purchased a train ticket for LaFountain to return to Stockton. In a later conversation, defendant's mother said it "would be [a] smart thing" if LaFountain was kept away from San Bernardino so she would not be there for the trial. Defendant denied that he tried to "prep" LaFountain in case she testified.

C.      *Prosecution Rebuttal Evidence*.

During phone calls defendant made to his father while in jail, defendant first said the money recovered from his vehicle belonged to LaFountain, and later said that only a portion of the money belonged to LaFountain. Defendant and his father also discussed prepping LaFountain for her testimony. Defendant's father told defendant "he needed to prep his female" "for all situations," and defendant responded, "Well, at least I tried." In a separate phone conversation, defendant's mother said it was best for LaFountain to stay

9

where she was because if she went to San Bernardino she might be arrested and have to testify against defendant.

> D. *Verdicts and Sentencing*.

A jury found defendant guilty of pimping and pandering as alleged in counts 1 and 2. The trial court sentenced defendant to the middle term of four years on count 1 and the middle term of four years on count 2, but stayed the sentence on count 2 pursuant to section 654.

This appeal followed.

## II.

## DISCUSSION

> A. *The Trial Court Did Not Abuse Its Discretion by Denying Defendant's Request at Trial to Discharge Retained Counsel*.

Defendant contends the trial court erred by denying his request to discharge his retained attorney and substitute a new retained attorney. According to defendant, the trial court applied the standard from *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*) to determine whether the attorney-client relationship had deteriorated so much that counsel should be relieved. This standard does not apply to a request to substitute one retained attorney for another, and defendant argues the trial court's denial of the request violated his right under the Sixth Amendment to the United States Constitution to retain competent representation of his own choice. We find no error.

1. Additional Background.

Defendant was represented by attorneys associated with the Law Offices of David Chesley for the four and a half months between the October 25, 2013 trial readiness conference and the first day of trial on March 11, 2014, when the parties announced they were ready for trial. The court heard motions in limine and began jury selection on the first day of trial. The next morning, defendant asked to address the court about his representation. After completing voir dire and swearing in the jury, the trial court allowed defendant to address the court. Defendant's attorney Melvin Betnun told the trial judge that defendant wanted to retain a new attorney. When the trial judge said he wanted defendant and Mr. Betnun to talk during the lunch break to try to work things out, defendant told the judge he had another attorney "ready to step in by the end of the week" and that he was already making "other arrangements." The trial judge informed defendant that he would not adjourn the trial "to wait for some lawyer to show up" because defendant had already chosen his attorney, the parties had already announced ready for trial, and a jury had already been sworn.

After the lunch break, defendant told the trial judge that he had tried to talk to Mr. Betnun but they had a conflict of interest. When defendant started to tell the judge his reasons for being dissatisfied with Mr. Betnun, the trial judge said he was going to treat the matter "like a *Marsden*" and excused the prosecutor and investigating officer from the courtroom. The trial judge again explained to defendant that the problem with his request was that the parties had already announced ready for trial and the trial had already started. Defendant told the judge that he had been "talking to a lawyer" but did

not have one standing by "because everybody's been telling me I cannot have a new lawyer come in when I still have one present." The trial judge permitted defendant to explain the reasons for his dissatisfaction and permitted Mr. Betnun to respond. The trial judge then denied defendant's request. "I'm not going to stop the trial. If you had another lawyer [who] was ready to take over, then it's between you and Mr. Betnun and whoever the [other] lawyer would be. But I'm not going to stop the trial. I'm not going to make the jury wait. The case is ready to go. Mr. Betnun is ready to go."

  2.  Analysis.

  "'The right to retained counsel of choice is—subject to certain limitations— guaranteed under the Sixth Amendment to the federal Constitution. (*United States v. Gonzalez-Lopez* (2006) 548 U.S. 140, 144, 151-152 . . . ; *People v. Ramirez* (2006) 39 Cal.4th 398, 422 . . . .) In California, this right "reflects not only a defendant's choice of a particular attorney, but also his decision to discharge an attorney whom he hired but no longer wishes to retain." (*People v. Ortiz* (1990) 51 Cal.3d 975, 983 . . . ; see Code Civ. Proc., § 284.)' (*People v. Verdugo* (2010) 50 Cal.4th 263, 310-311 . . . .)" (*People v. Maciel* (2013) 57 Cal.4th 482, 512 (*Maciel*).)

  "In view of the importance of [the defendant's rights to retain and discharge counsel of his choice] and the severe consequences which flow from their violation, the trial courts are required to 'make all reasonable efforts to ensure that a defendant financially able to retain an attorney of his own choosing can be represented by that attorney.' (*People v. Crovedi* [(1966)] 65 Cal.2d [199,] 207.) To this end, 'the state should keep to a necessary minimum its interference with the individual's desire to

defend himself in whatever manner he deems best, using any legitimate means within his resources . . . .' (*Id.* at p. 208.)" (*People v. Courts* (1985) 37 Cal.3d 784, 790.)

"Because the right to discharge retained counsel is broader than the right to discharge appointed counsel, a *Marsden*-type hearing at which the court determines whether counsel is providing adequate representation or is tangled in irreconcilable differences with the defendant is "'[an] inappropriate vehicle in which to consider [the defendant's] complaints against his retained counsel.'" [Citations.]" (*People v. Keshishian* (2008) 162 Cal.App.4th 425, 429.)

"'The right to discharge a retained attorney is, however, not absolute. (*Ortiz*, [*supra*, 51 Cal.3d] at p. 983.) The trial court has discretion to "deny such a motion if discharge will result in 'significant prejudice' to the defendant [citation], or if it is not timely, i.e., if it will result in 'disruption of the orderly processes of justice . . . .'"" (*Verdugo*, *supra*, 50 Cal.4th at p. 311; see *Morris v. Slappy* (1983) 461 U.S. 1, 11 . . . ['Trial judges necessarily require a great deal of latitude in scheduling trials.'].)" (*Maciel*, *supra*, 57 Cal.4th at p. 512.)

"[T]he 'fair opportunity to secure counsel of choice provided by the Sixth Amendment 'is necessarily [limited by] the countervailing state interest against which the sixth amendment right provides explicit protection: the interest in proceeding with prosecutions on an orderly and expeditious basis, taking into account the practical difficulties of "assembling the witnesses, lawyers, and jurors at the same place at the same time."' The trial court, however, must exercise its discretion reasonably: 'a myopic insistence upon expeditiousness in the face of a justifiable request for delay

13

can render the right to defend with counsel an empty formality.' [Citation.]" (*Ortiz*, *supra*, 51 Cal.3d at pp. 983-984.) "[T]he court should 'balance the defendant's interest in new counsel against the disruption, if any, flowing from the substitution.'" (*People v. Keshishian*, *supra*, 162 Cal.App.4th at p. 429, quoting *People v. Lara* (2001) 86 Cal.App.4th 139, 153.)

"The erroneous denial of a motion to substitute counsel constitutes structural error and mandates reversal of the defendant's conviction without requiring a showing of prejudice. [Citation.] However, we apply an abuse of discretion standard of review to a trial court's denial of a motion to relieve retained counsel. [Citations.]" (*People v. Dowdell* (2014) 227 Cal.App.4th 1388, 1411, fn. omitted.) The abuse of discretion standard is especially appropriate when the trial court's ruling is tantamount to denial of a continuance to retain new counsel. (*Id*. at p. 1411, fn. 8.)

As an initial matter, we reject defendant's main argument—that the trial court erred by applying the inapplicable *Marsden* test when it denied defendant' request. When defendant began to describe his dissatisfaction with Mr. Betnun, the trial judge said it would treat the matter "*like* a *Marsden*," not *as* a *Marsden* hearing. (Italics added.) The record clearly demonstrates the trial judge merely borrowed from *Marsden* the practice that the prosecutor and investigating officers be excused from the courtroom during discussion of privileged matters and questions of evidence and trial tactics that might be beneficial to the prosecutor. (See *People v. Knight* (2015) 239 Cal.App.4th 1, 6 ["Typically, when conducting a *Marsden* hearing, trial courts exclude the district attorney upon defendant's request and 'whenever information would be presented during the

14

hearing to which the district attorney is not entitled, or which could conceivably lighten the prosecution's burden of proving its case.'"].)

The record does not support the suggestion that the trial judge denied defendant's request because it concluded—à la *Marsden*—that Mr. Betnun was rendering competent representation or that Betnun and defendant's attorney-client relationship was not irreconcilably fractured. Instead, the record clearly demonstrates the trial judge denied the request because it would have required a continuance and unreasonably delayed the trial. Nor do we find any error in the trial judge's discussion of Mr. Betnun's competence to represent defendant. A trial court reviewing a request to discharge retained counsel must consider the totality of the circumstances, and the court may properly consider the absence of incompetence of counsel and irreconcilable differences between the defendant and retained counsel "in deciding whether discharging counsel would result in disruption of the orderly processes of justice." (*Maciel*, *supra*, 57 Cal.4th at p. 513.)

We conclude the trial court properly denied defendant's request because it would have necessitated a continuance and delayed defendant's trial. Defendant did not request to discharge his attorney until the second day of trial, after the trial court had already heard motions in limine and started to voir dire a jury. Although defendant said he was making "other arrangements," his comments were equivocal about when he could substitute a new attorney who was ready to proceed to trial. Defendant told the trial judge that he had an attorney "ready to step in by the end of the week," but that he did not have one standing by. On this record, we cannot conclude defendant "made a good faith, diligent effort to obtain [substitute] retained counsel before the scheduled trial date."

15

(*People v. Jeffers* (1987) 188 Cal.App.3d 840, 850.)  The trial lasted three days, which was the original trial estimate, and the jury was likely not qualified for a longer period. Granting defendant's request would have required an indefinite continuance and perhaps required release of the jury and selection of a new one.  Under these circumstances, we conclude the trial court did not abuse its discretion by denying defendant's request.

B.      *The Record Contains Substantial Evidence to Support Defendant's Conviction for Pandering*.

Defendant contends the evidence in this case was insufficient to prove he was guilty of pandering in violation of section 266i, subdivision (a)(1).  We conclude the evidence does support the conviction.

"'The law is clear and well settled.  "On appeal we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.]"'"  (*People v. Jones* (2013) 57 Cal.4th 899, 960.)  "In conducting such a review, we '"presume[] in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." [Citations.]'"  (*People v. Lee* (2011) 51 Cal.4th 620, 632.)  In addition, "we draw all reasonable inferences necessary to support the judgment.  [Citation.]"  (*People v. Stitely* (2005) 35 Cal.4th 514, 543.)

"'"'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court[,] which must be

16

convinced of the defendant's guilt beyond a reasonable doubt. "'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.'" [Citations.]'"'" (*People v. Harris* (2013) 57 Cal.4th 804, 849-850.) These standards apply equally when the prosecution relies primarily on circumstantial evidence. (*People v. Salazar* (2016) 63 Cal.4th 214, 242.)

Defendant's sole argument for reversal of his conviction for pandering is that the evidence focused on LaFountain's "collaboration with appellant after she was a prostitute," how he "aided" LaFountain to pursue her prostitution, and that the evidence did not show defendant "caused" or persuaded LaFountain "to become a prostitute." The implication of defendant's argument is that a defendant may only be found guilty of pandering if he or she persuades a person who is *not currently* a prostitute to become a prostitute. We disagree.

"[P]andering comprises a broad range of conduct. The purpose of Penal Code section 266i is to ''. . . cover all the various ramifications of the social evil of pandering and include them all in the definition of the crime' . . . .' [Citation.]" (*People v. DeLoach* (1989) 207 Cal.App.3d 323, 333.) Section 266i, subdivision (a), has six subparts which "'define the different circumstances under which the crime of pandering may be committed.'" (*People v. Leonard* (2014) 228 Cal.App.4th 465, 490, quoting *People v. Lax* (1971) 20 Cal.App.3d 481, 486.) The requirement that a defendant persuade another person "'to become a prostitute'" is found in section 266i, subdivision (a)(2). (See *People v. Scally* (2015) 243 Cal.App.4th 285, 293.)

17

Section 266i, subdivision (a)(1)—the actual basis for defendant's conviction—does not include such a requirement. Instead, section 266i, subdivision (a)(1) provides: "[A]ny person who does any of the following is guilty of pandering, a felony, and shall be punishable by imprisonment in the state prison for three, four, or six years: [¶] (1) Procures another person for the purpose of prostitution."

In any event, the California Supreme Court explicitly rejected defendant's argument. "The language of the pandering statute describes current conduct on the part of the defendant: inducing and encouraging. That current conduct is aimed at producing subsequent conduct by the target: that the target thereafter engage in acts of prostitution following a defendant's inducement or encouragement." (*People v. Zambia* (2011) 51 Cal.4th 965, 975 (*Zambia*).) "[We] conclude that the proscribed activity of encouraging someone 'to become a prostitute,' as set forth in section 266i, subdivision (a)(2), includes encouragement of someone who is already an active prostitute. . . ." (*Zambia*, *supra*, at p. 981.)

Addressing the portion of the pandering statute at issue in this case, the Supreme Court wrote the following: "Subdivision (a)(1) criminalizes the '[p]rocur[ing of] *another person* for the purpose of prostitution.' (§ 266i, subd. (a)(1), italics added.) Whether taken literally or figuratively, there is no reason to conclude the term 'another person' as used in subdivision (a)(1) would not encompass both prostitutes and nonprostitutes, as either can plainly be 'procured' for the purpose of prostitution." (*Zambia*, *supra*, 51 Cal.4th at p. 977; see *id.* at p. 978 ["Subdivision (a)(1), and (a)(3) through (a)(6), of section 266i, when harmonized and read together in context, plainly envision that any

18

solicited 'person,' whether an active prostitute or not, may be the target of unlawful pandering."].)  Therefore, that the evidence showed LaFountain was already a prostitute when she met defendant and that the People did not prove defendant persuaded LaFountain *to become* a prostitute in the first place, is entirely irrelevant.

The trial court correctly instructed the jury that to find defendant guilty of pandering in violation of section 266i, subdivision (a)(1), it had to find "defendant persuaded or procured Allison LaFountain to be a prostitute," and that he "intended to influence Allison LaFountain to be a prostitute."  (See CALCRIM No. 1151.)  During deliberations, the jury asked the trial court to define the word "procured."  The court answered by instructing the jury to "apply the ordinary, everyday meaning to the word 'procure,'" which included, inter alia, "'persuade.'"

The definition of "procure" given to the jury comports with the well-established definition of that word in pandering cases.  "[T]he term 'procure' as used in the first clause of section 1 of the statute [current section 266i, subdivision (a)(1)] necessarily implies the use of persuasion, solicitation, encouragement and assistance in achieving the unlawful purpose . . . ."  (*People v. Montgomery* (1941) 47 Cal.App.2d 1, 12, disapproved on other grounds by *Murgia v. Municipal Court* (1975) 15 Cal.3d 286, 301, fn. 11, *People v. Dillon* (1983) 34 Cal.3d 441, 454, fn. 2, & *Zambia, supra,* 51 Cal.4th at p. 981; accord, *People v. Schultz* (1965) 238 Cal.App.2d 804, 812 ["the term 'procure' means assisting, inducing, persuading or encouraging"]; see bench notes to CALCRIM No. 1151 (2016) p. 891.)

We conclude substantial evidence supports defendant's conviction for pandering. Defendant met LaFountain in Stockton, and he knew she was prostituting herself there. After staying in the Los Angeles area for a few months, defendant encouraged LaFountain to come down from Stockton. Defendant paid for LaFountain's train ticket and paid for her to stay in a series of hotels in Southern California. The evidence and the reasonable inferences drawn from it showed defendant set up sexually explicit advertisements on backpage.com and myredbook.com for a range of paid sexual services from LaFountain. Defendant used his name and various aliases to register the advertisements. He listed the phone number and address of his father's business in Stockton, and the addresses of places defendant and his parents used to live, as well as a number of fake addresses in Stockton.

Defendant booked and paid for a three-night stay for himself and LaFountain at the Fairfield Inn in Ontario, which corresponded to online advertisements for sexual services from LaFountain in Ontario. Hotel staff noticed a number of men coming and going from defendant's room and called the police to report the room was possibly being used for prostitution. Using the names from the hotel registry, the police found the online advertisements for LaFountain under the name "Ari." The police also matched the photograph of "Ari" from the advertisements to LaFountain's DMV photo. After arranging a "date" with LaFountain, an undercover officer went to defendant's room and arrested LaFountain. Inside the room, the police found condoms and various other items, including a notebook with "my rates" and other prostitution terminology printed in it. The notebook also included various male names, types of service, amount of time men

20

stayed, the amount of money they spent, information related to the online advertisements, as well as defendant's name and aliases including "Daddy," a name commonly used by prostitutes for their pimps.

A contact in LaFountain's cellular phone for "Daddy" matched the number for defendant's iPhone. Police found $7,360 in cash in defendant's vehicle and another $360 in cash in his pocket during booking. A search of defendant's phone showed that after a client left the room, LaFountain sent defendant a text message which read, "He just left. 350 daddy." Defendant responded, encouragingly, "Fo sholey" followed by an exclamation point, and "I'm a repost." LaFountain texted defendant various other times during the day to keep him informed of the "dates" she had arranged and when the men left the room. After his arrest, defendant spoke to his parents, who told defendant he should encourage LaFountain to go back to Stockton and stay away from the trial. Defendant's father also told defendant "he needed to prep his female" "for all situations," and defendant responded he had tried.

The record contains ample evidence from which a reasonable jury could conclude beyond a reasonable doubt that defendant "procured" LaFountain to be a prostitute, in violation of section 266i, subdivision (a)(1), by persuading, encouraging, and assisting LaFountain to engage in prostitution. The evidence shows more than mere assistance and, instead, shows defendant persuaded and encouraged LaFountain to move her prostitution activities from Stockton to Southern California, and made her dependent on him for her basic needs.

21

## III.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
J.

We concur:

RAMIREZ
P. J.

SLOUGH
J.