[Crim. No. 10817.   Second Dist., Div. Three.   May 25, 1966.]

THE PEOPLE, Plaintiff and Respondent, v. CURTIS SILAS HELMS, JR., et al., Defendants and Appellants.

Curtis Silas Helms, Jr., in pro. per. for Defendant and Appellant Helms. Donald Jacobs, under appointment by the District Court of Appeal, for Defendant and Appellant Lyons.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Stanton Price, Deputy Attorney General, for Plaintiff and Respondent.

KAUS, J.—Defendants Helms and Lyons were each charged with burglary, robbery and assault with a deadly weapon. A jury convicted both of burglary and robbery but only Helms was found guilty of the assault charged. The victim of the crimes was one Nelson Heindl.

On appeal the sufficiency of the evidence is not questioned except with respect to the assault count, where it is claimed that a pillow cannot be a "deadly weapon." The case was tried November 1964, after the Supreme Court had granted a rehearing following its first decision in *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]. The trial judge expressly refused to follow the principles expressed in the first *Dorado* opinion, subsequently reaffirmed.[1] The record therefore contains what the Attorney General must concede is error, but since no confession was obtained from either defendant and an automatic reversal is therefore not compelled, a rather detailed recital of the evidence becomes necessary. (*People* v.

[1] Judge Dawson, who presided at the trial which started on November 5, 1964, died November 22, 1964. Judge Clinco sentenced defendants January 6, 1965.

*Hillery,* 62 Cal.2d 692, 712-713 [44 Cal.Rptr. 30, 401 P.2d 382].)

### The Evidence—People's Case.

■ *Nelson Heindl.* On the morning of January 24, 1964, Heindl left his home in Downey. His wife had previously called Shirley Smith, the Heindl maid, and left the front door open for her. Mrs. Heindl also left at about 8 a.m. At 10:15 Heindl returned home and saw a 1955 Ford stationwagon, later identified as belonging to Helms' father, on his driveway. He parked his car behind the Ford in order to block its exit. He went to the front door which was locked. He went to the back door, which he opened with his key and entered. He saw Helms standing in the kitchen. At that point Helms dashed into the front hallway and hid. Heindl called for Shirley Smith several times. When he received no response Helms called from where he was hiding: "That's why we are here." He then started to hit Heindl with his fist. Lyons entered from the rear of the house, wearing a hat. Both forced him into the family room. The beating continued for five or six minutes and he went down on the floor. Neither defendant said anything. At one point Heindl looked up and saw Lyons standing with a pipe wrench "in a threatening position." The wrench did not belong to Heindl. When the beating stopped Lyons dropped the wrench,[2] went into the living room, returned with a pillow and handed it to Helms who then placed it over Heindl's face and attempted to smother him. This lasted for several minutes. Heindl was then tied up at his ankles, knees and hands and blindfolded. Helms wanted to know where Heindl kept his money. Heindl denied that there was money in the house and he was then gagged. The defendants left, leaving the wrench behind. The entire episode lasted about 15 to 20 minutes. Later Heindl discovered that his wristwatch, wallet, credit cards and appointment book had been taken. The wallet contained $125. It was also discovered later that all of his suits, shirts, his wife's jewelry, a camera and a portable television had been taken. A small electronic unit which operates a garage door had been on the front seat of Heindl's car and it was missing too.

After the defendants left Heindl tried to release himself. One of them returned—he could not tell which—reached into his pocket for his car keys and applied a "knee drop" to his head.

---

[2] No evidence concerning fingerprints was offered by either side.

Heindl bled profusely and was taken to a hospital. There he identified the defendants from a group of photographs brought to him by a police officer.

On cross-examination Heindl testified that he did not notice a moustache on Helms or ''recognize'' one on Lyons. The arresting officer later testified that both defendants wore moustaches at the time of their arrests which took place well within 24 hours after the crimes.

In other respects, apart from minor discrepancies between Heindl's testimony at the trial and that at his preliminary hearing—at which he had testified from his bed at the hospital —Heindl's version of the facts and particularly his identification remained unimpeached.

*Nola Morris.* This witness was a neighbor of the Heindls. At about 10 a.m. of January 24, 1964, she saw a 1955 Ford stationwagon on the Heindl driveway. One Negro got out of the car and another remained seated in it. The one who got out then entered the house through the front door, the other followed shortly thereafter. She then saw Heindl arrive. Thirty minutes later she observed two Negroes come out of the house. They were of similar build and appearance as Helms and Lyons. She was unable to distinguish any special features of the two individuals because of the distance. One of them was wearing a hat. They were carrying what looked like a blanket and some object which was covered and ''obviously heavy.'' One of them got into Heindl's car and the other into the stationwagon.

*Daniel H. O'Donovan.* This witness, a police officer of the City of Downey talked to Lyons sometime after he was arrested on the day of the crime.[3] Lyons gave conflicting stories. He first said that he had spent the evening of January 23 with Shirley Smith. Then someone called White came to her home and there was a fight about who would spend the night with Miss Smith. Lyons was injured in the fight, but won and stayed for the night. He did not leave her home on the morning of the 24th. Lyons then embellished his story and said that although the incident with White had taken place, Helms too had been at Miss Smith's home both in the evening and until 8 a.m. the following morning, that both had questioned her about the wealth of Heindl, what type of clothing, suits and things he kept at his house and that at one point Helms had invited him to go on a burglary of the Heindl

---

[3]This conversation was admitted only against Lyons.

residence. Lyons also told Officer O'Donovan that Helms returned later in the morning and gave Lyons the keys to a 1963 Cadillac in which he arrived.

Helms was arrested by the officer in the early morning hours of January 25 at his father's residence in San Pedro. He and another officer had been waiting for him when he arrived in the Ford stationwagon. The car was impounded and taken by towtruck to a lot or garage where it was searched.[4] After a cursory search at the scene of the arrest, which turned up nothing, another search was made in the "daylight morning hours of the 25th or 26th." Under the front passenger seat it revealed the electronic unit which had been taken from Heindl's car.

On the way to the station Helms denied any participation in the crimes. In the meanwhile Miss Smith had also been arrested. She, Lyons and Helms were brought into each other's presence. Miss Smith turned to Helms and said that she was ashamed of him "to think that he would have robbed and burglarized her employer." Helms remained silent.

At one point after Helms was in custody, Officer O'Donovan told Helms that the police had been advised by Helms' father that he had borrowed his car—apparently the 1955 Ford— early "that morning." Helms agreed and said that the reason he borrowed the car was that someone by the name of Renfrow, whom he had met once or twice in a poolroom, had promised him $75 for the use of the car for one day. Helms recalled having loaned the car to Renfrow but could not remember when it was returned to him.

Neither defendant was told of his constitutional rights. On cross-examination the officer testified that his purpose in bringing Miss Smith and the defendants into a room together was "to see if an accusatory statement would be made by any of the defendants and to record any conversation that the defendants might make in the presence of one another . . . it wasn't a purpose to provoke anything. It was merely to see if an accusatory statement would be made or any admissions made by any of the three defendants." At that time he had already obtained Lyons' admission about the discussion which the defendants had with Miss Smith and Lyons' denial of having participated in the crime.

---

[4]At this point counsel objected to the warrantless search of the automobile, relying on *People* v. *Burke*, 61 Cal.2d 575 [39 Cal.Rptr. 531, 394 P.2d 67]. The objection was overruled.

### Defense.

*Curtis L. Helms, Sr.* The father of Helms was working in a cleaning establishment in San Pedro on the day of the crimes. He saw his son there between 9:30 and 10 a.m. He stayed from 10 to 15 minutes and then borrowed his car. He saw him again at the time of the arrest after midnight. At that time the officers looked in the car, under all of the seats. He never saw the electronic door opener until he appeared in court.

*Defendant Helms.* On January 24 he had to do some moving and borrowed his father's car for the purpose. He left the cleaning establishment in San Pedro at about 10 a.m. He went by his mother's house, drove to a poolroom in Los Angeles and loaned the car to a friend who returned it at about 3:30 or 4 p.m.

He denied Miss Smith's accusatory statement as reported by Officer O'Donovan. His version of what she said was "did you have anything to do with this? If you did, it would hurt me to think that you would do anything like that." He also denied telling O'Donovan about the Renfrow loan of the car. He admitted knowing Lyons, admitted that he had been at the residence of Miss Smith the night of January 23, but denied any discussion about her employer. The first time he had seen the electronic unit was at the preliminary hearing. The friend to whom he later on loaned his father's car had taken him to San Pedro on the morning of the 24th in a 1963 Cadillac. He never did get around to using the stationwagon to help him move. He had been at the Heindl residence on one previous occasion, just to drop Miss Smith off.

Helms did rather poorly in giving his reasons for not using the stationwagon for the purpose for which he had borrowed it from his father. He admitted a previous robbery conviction. Having obtained this admission the prosecutor, apparently within the hearing of the jury, attempted to introduce a document "which bears exemplifications and certifications." The court on its own motion rejected the offer.

*Defendant Lyons.* He spent the evening and night of January 23 at Miss Smith's home and remained there continuously until his arrest at about noon of the next day. Sometime during the morning Miss Smith received a telephone call and she identified the caller as Mrs. Heindl. She then asked Lyons to take her to work, but he did not do so. Helms had been at the home the evening before and was still there when Lyons went to sleep. He was gone when he awoke.

Lyons denied telling Officer O'Donovan that there had been any discussion about the wealth of the Heindl family or that Helms had proposed a burglary.

On cross-examination Lyons admitted that he had taken Miss Smith to work on several occasions. At the time when he was questioned before his arrest he had certain papers on him which identified a Claude Matthews, a close friend of his. He did not give a false name at the time of his arrest. The officers merely jumped to a conclusion that he was Matthews, "so that's who I was."[5]

### *Voir Dire.*

Before Officer O'Donovan testified in front of the jury the court held a hearing on the legality of the search of the car. The following testimony was offered.

*Officer Johnson.* This witness was called to the Heindl residence shortly after the burglary. He was informed that Miss Smith was the only person who would have known that the residence would be unlocked, but could not remember whether he was told that Miss Smith had been informed that it would be unlocked that specific day. He then obtained a description of the two subjects. Each was described to him as a male Negro, about 25 years old, 6 feet tall, weighing 180 pounds. There was a description of a vehicle, but he could not recall what it was. He then went to the home of Miss Smith, was admitted and talked to her and Lyons individually. He advised each that he was investigating a crime which had happened that morning and asked each to identify himself. Lyons said that his name was Claude Matthews and produced papers to prove it. He said that he had been at the residence since the previous evening.

---

[5] His entire testimony on this point was as follows: "Q. Did you give a correct name when you were questioned at Miss Smith's house upon the first occasion? A. It was a little discretion in that, sir, about that name and everything. Actually what it was, I didn't state the name that was given on that report there. I didn't state it, but I did have some identification on me which belonged to a Claude Matthews, which is a close friend of mine. I know a Claude Matthews. Q. Did you tell them your name at all, then? A. Well, actually, yes. Not my whole name, though. I told them my first name and the other detective, the gentleman back there, he already knew my last name. Q. Did Shirley Smith give your name in your presence? A. Not in my presence. Q. What information or name did you give as to who you were? A. Well, they called me Claude, so that's who I was." There was no error in referring to the incident. When this testimony was admitted the court had already heard about the circumstances of the impersonation from Officer Johnson, who first interviewed Lyons and it is clear that the accusatory stage had not been reached. See summary of Officer Johnson's testimony below.

Miss Smith admitted being employed by the Heindl's and said that the reason why she had not gone to work that day was that Lyons had refused to take her there. She said that he had done so in the past and that someone by the name of Helms had also driven her there and picked her up. She added that Lyons had asked her whether Heindl had any furs or money at his home and that the last time he had done so was the night before.

A 1963 Cadillac convertible was parked in the driveway and both Miss Smith and Lyons said that it belonged to Helms. Lyons said that he had the keys to the car in his possession. A check revealed that the license plates on the car were registered to a 1956 Lincoln in the name of Curtis Helms and that the Cadillac had been reported as a stolen vehicle in Long Beach. Lyons admitted having driven the car on several occasions. By that time Miss Smith had revealed Lyons' true name. The officer could not recall Lyons' explanation for giving a false name. Miss Smith and Lyons also told the officer that Helms had been at her home until that morning and that Helms had left at about 8 a.m. At that time he placed Lyons under arrest.

The telephone rang, Lyons answered and stated to the officer that the caller was Helms who wanted to be picked up at a cafe on Central Avenue. The suspects were then taken to the Downey police station. Whatever information Officer Johnson had he relayed to Officer O'Donovan.

On cross-examination the officer said that Lyons and Miss Smith described Helms as being 5 feet 11 inches tall, weighing 165 pounds and that he wore his hair combed straight on the sides. He could not recall whether Miss Smith had told him that Helms was present when Lyons asked her about the wealth of her employers.

*Officer O'Donovan.* As already noted, this witness arrested Helms in the early morning hours of January 25. He impounded the vehicle at the place of arrest and searched it the next morning. He then found the electronic device, took it to the Heindl residence and activated the garage door.

He then testified concerning the incriminating statements previously referred to as having been made by Lyons after his arrest, and about Helms' silence in the face of Miss Smith's accusation. Motions to suppress the evidence found in the stationwagon and the statements were denied.

It is evident from the foregoing that Heindl's testimony alone amply supports the robbery and burglary convictions. As

far as clearly admissible evidence is concerned, he was corroborated in the following respects: 1. Mrs. Morgan's view of a 1955 Ford stationwagon on the Heindl driveway and her identification of Helms and Lyons, such as it was. 2. Lyon's presence at the home of Miss Smith, who knew that the Heindl home would be unlocked that morning, his testimony that Helms was at the Smith residence the evening before his impersonation of ''Matthews'' and his admission that he had taken Miss Smith to work on several occasions. 3. Helms' admissions that he knew Lyons and had been at Miss Smith's residence the night of January 23 and had taken her to work on one previous occasion.[6] 4. Helms' possession, at the time of his arrest, of a vehicle of the same type as that observed at the scene by Heindl and Mrs. Morgan.

It is equally clear that Lyons' conflicting stories, his admission about questioning Miss Smith concerning the contents of the Heindl home and his statement that Helms had invited him to go on a burglary were not only inadmissible under *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361], but that Helms has standing to complain of the error. *People* v. *Aranda,* 63 Cal.2d 518, 524-527 [47 Cal.Rptr. 353, 407 P.2d 265].)

Erroneous too, was the admission of Helms' strange story about the loan of his father's automobile to Renfrow, which he later repudiated from the stand. (*People* v. *Hillery,* 2 Cal.2d 692, 712 [44 Cal.Rptr. 30, 401 P.2d 382].)

Another error was the failure to suppress the evidence obtained by the search of the stationwagon. The facts concerning this search are indistinguishable from *People* v. *Burke,* 61 Cal.2d 575, 579 [39 Cal.Rptr. 531, 394 P.2d 67] and *Preston* v. *United States,* 376 U.S. 364, 366-367 [84 S.Ct. 881, 11 L.Ed.2d 777]. We cannot distinguish these authorities on the basis that here the evidence was found under a seat, while in *Burke* it was in a locked trunk and in *Preston* in the glove compartment—apparently unlocked—and in the trunk, locked but accessible through the back seat of the car. While a perfectly legal search at the time of the arrest would have disclosed, had it been more thorough, what was under the seat, the unfortunate fact is that it did not. The illegality of the searches in

---

[6]This is not a case where defendants' testimony was impelled by the erroneous admission of their incriminating statements. (Cf. *People* v. *Polk,* 63 Cal.2d 443, 449-450 [47 Cal.Rptr. 1, 406 P.2d 641]; *People* v. *Nye,* 63 Cal.2d 166, 175-177 [45 Cal.Rptr. 328, 403 P.2d 736].) It seems clear that what prompted defendant to testify was Heindl's positive identification.

*Burke* and *Preston* did not depend on the location of the articles in the automobile, but on the time and distance differentials between the search and the arrest.

We must also hold that the admission of Helms' silence in the face of the accusatory statement by Miss Smith was error. This is compelled by the holding in *People* v. *Cockrell,* 63 Cal.2d 659, 669-670 [47 Cal.Rptr. 788, 408 P.2d 116]. There a police officer testified that a person accused Mr. Cockrell, in the officer's presence, of having directed her to Mrs. Cockrell for a successful purchase of marijuana. After this accusation was made, the officer asked Mr. Cockrell what he had to say about it and he remained silent. The decision of the Supreme Court is based upon the proposition that although it does not affirmatively appear that Cockrell's silence indicated that he was invoking his privilege against self-incrimination, he had a right to remain silent and because of *Griffin* v. *California,* 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229] no adverse inference could be drawn from his silence.[7]

Although the record, analyzed in the light of applicable law, thus contains several errors, none of them compel an automatic reversal. Each is of a type held expressly to be subject to section 4½, article VI of our California Constitution. (*People* v. *Parham,* 60 Cal.2d 378, 385 [33 Cal.Rptr. 497, 384 P.2d 1001]—illegally obtained physical evidence; *People* v. *Hillery,* 62 Cal.2d 692, 712 [44 Cal.Rptr. 30, 401 P.2d 382] and *People* v. *Robinson,* 62 Cal.2d 889, 896 [44 Cal.Rptr. 762, 402 P.2d 834]—exculpatory statements, evidencing a consciousness of guilt; *People* v. *Luker,* 63 Cal.2d 464, 475 [47 Cal.Rptr. 209, 407 P.2d 9]—admissions; *People* v. *Cockrell,* 63 Cal.2d 659, 669-671 [47 Cal.Rptr. 788, 408 P.2d 116]—silence in face of accusation.)

Under the constitutional mandate of section 4½, article VI, our Supreme Court has authoritatively declared that the question to be asked is whether it is "reasonably probable that a result more favorable to the appealing party would have been reached in the absence of error." (*People* v. *Watson,* 46 Cal.2d 818, 836 [299 P.2d 243].) The Supreme Court of the United States, on the other hand, has said that—assuming the erroneous admission of evidence obtained by an illegal search and seizure to be subject to the normal rules of "harmless

[7]Factually the only distinction between *Cockrell* and the present case is the verbal injection of the police officer in *Cockrell,* which could be construed as an "interrogation" without warning. Our Supreme Court, however, does not refer to the *Escobedo-Dorado* rule and its seems reasonable, therefore that it considered that factor to be insignificant.

error"—the inquiry is "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." (*Fahy* v. *Connecticut,* 375 U.S. 85, 86-87 [84 S.Ct. 229, 11 L.Ed.2d 171].) In *People* v. *Bostick,* 62 Cal.2d 820, 824 [44 Cal.Rptr. 649, 402 P.2d 529] our own Supreme Court appears to assume that the *Fahy* standard is applicable to any error which constitutes "a denial of due process or a violation of some other constitutional right . . ."

We therefore view the record on the assumption that the more stringent federal test is applicable to all the erroneously admitted evidence, singly and collectively. After a thorough study of the record we have reached the conclusion that, unless the *Fahy* standard is to be interpreted in the sense that "anything is reasonably possible", which we decline to do and which we note our own Supreme Court has not done,[8] the errors below were not prejudicial. The identification by Heindl on the witness stand, corroborated by his own identification from photographs shown to him at the hospital (*People* v. *Gould,* 54 Cal.2d 621, 626 [7 Cal.Rptr. 273, 354 P.2d 865]), corroborated also by Mrs. Morgan and the coincidence—almost incredible assuming that Heindl was sincere—of both defendants being acquainted with Miss Smith and having been with her a few hours before the burglary, make the illegally obtained and admitted evidence so much frosting on the cake.

Other contentions advanced by defendants need not detain us long. Defendant Helms claims that a pillow cannot be a deadly weapon. The evidence shows that he used the pillow attempting to smother Heindl. If, for a reason unknown to us, he had not desisted, Heindl would have suffocated. ■ "A deadly weapon is one likely to produce death or great bodily injury. (*People* v. *Fuqua,* 58 Cal. 245, 247.) ■ However, the deadly character of the weapon may depend on the manner in which it is used, in which case the determination is one for the jury under proper instructions (*People* v. *Fuqua,* 58 Cal. 245; *People* v. *Simpson,* 134 Cal.App. 646, 651 [25 P.2d 1008].)" (*People* v. *Tophia,* 167 Cal.App.2d 39, 47 [334 P.2d 133].) ■ We cannot say that the implied finding of the

[8]See for example *People* v. *Ebner,* 64 Cal.2d 297 [49 Cal.Rptr. 690, 411 P.2d 578]; *People* v. *Gilbert,* 63 Cal.2d 690 [47 Cal.Rptr. 909, 408 P.2d 365]; *People* v. *Cockrell,* 63 Cal.2d 659 [47 Cal.Rptr. 788, 408 P.2d 116]. Our Supreme Court has both impliedly and expressly recognized that the *Watson* and *Fahy* standards are not the same. (*People* v. *Brooks,* 64 Cal.2d 130 [48 Cal.Rptr. 879, 410 P.2d 383].)

jury, that the manner in which Helms used the pillow made it a deadly weapon, is not supported by the evidence.

Finally Helms complains that the prosecutor committed misconduct in attempting to prove his prior felony conviction two ways, that is to say by Helms' admission from the stand and by producing a copy of the judgment of conviction.

We do not believe that any possible prejudice resulted to Helms. Technically the judgment was never admitted in evidence. Even if we assume that the jury knew the nature of the document, which is probable, no prejudicial harm was done.

It appears, however, incontrovertible that all offenses committed by defendants were "incident to one objective." (*People* v. *McFarland,* 58 Cal.2d 748, 760-763 [26 Cal.Rptr. 473, 376 P.2d 449] ; *Neal* v. *State of California,* 55 Cal.2d 11, 18-21 [9 Cal.Rptr. 607, 357 P.2d 839].) As was pointed out in *People* v. *McFarland, supra,* the fact that the burglary was complete in each case before the robbery and the assault, is immaterial. (*People* v. *McFarland, supra,* p. 762.) As we read the record it permits of no conclusion other than that each crime was "incident to and a means of" obtaining Heindl's possessions.

The judgments are therefore reversed only insofar as they impose multiple punishment and the cause is remanded to the trial court for the purpose of sentence according to law. In all other respects the judgments are affirmed.

Shinn, P. J., and Ford, J., concurred.